# HENRY FULMER v. DAVID WILLIAMS.

ERROR TO THE COURT OF COMMON PLEAS OF LEHIGH COUNTY.

Argued January 30, 1888—Decided October 8, 1888.

1. In Pennsylvania, navigability in fact, not the ebb and flow of the tide, is made the test by which the character of a stream as public or private is determined, and the great but tideless rivers of the state are therefore held to be public highways, belonging to the state and held for the use of all her citizens.
2. A grant of land bounded upon a stream, not navigable, extends usque ad medium filum aquae; but a grant of land bounded upon a navigable river extends to ordinary low-water mark only.
3. Between high-and low-water mark upon a navigable river, the grantee takes subject to the rights of the public, and, as between him and the public, he may use his land below high-water mark for such purposes as do not interfere with the free flow and navigation of the waters.
4. Adjoining owners upon a navigable stream, as between themselves, are owners of the soil above the low-water mark, and must observe the obligations growing out of such ownership and proximity; one has no more right to injure the other with the flowing waters than with the waters of a non-navigable stream.
5. A shore-owner has no right to erect a dam to turn the water to his mill, without a grant from the commonwealth; if he do so, he becomes a trespasser and acquires no title to the water power resulting therefrom.
6. The mill-owner having no title to the water, whether above or below low-water mark, he can have no legal right to the power resulting from his erection of a dam in the stream, and its diversion by an upper shore owner is, therefore, damnum absque injuria.
7. The shore-owner, however, may recover from an upper owner when the latter by an unlawful invasion of the bed of the stream has deprived the plaintiff of convenient access to the water and a proper use of it as unaffected by his own unlawful act.

Before GORDON, C. J., PAXSON, STERRETT, GREEN and WILLIAMS, JJ.; TRUNKEY and CLARK, JJ., absent.

No. 189 July Term 1886, Sup. Ct.; court below, No. 55 January Term 1884, C. P.

On December 11, 1883, an action in case was begun by David Williams against Henry Fulmer. The narr filed averred that the plaintiff was the owner in fee of a parcel of land

near the borough of Slatington, bounded on the east by an arm or branch of the Lehigh river, upon which he had erected and for many years maintained and operated a factory for the manufacture of school slates, and that he had "and ought to have the use and benefit of a certain water course or branch of the river Lehigh running to the factory aforesaid for water power and other purposes."

The first count then charged that the defendant, being the owner of land immediately adjoining the plaintiff, and above him, did engage in the quarrying and dressing of roofing slate from a certain quarry found on his land, and in conducting his said business he had dumped and thrown large quantities of rock, rubbish and refuse slate into said water course along his lands and immediately above the property of the plaintiff, thus forming a large bank or barrier of rubbish in the channel, forcing the water away from the plaintiff's property and diverting its usual course, so that the volume of water had been so much decreased that the plaintiff could no longer operate said factory by water power, as he was wont to do before said barrier was formed, and he was deprived of the use of the said water course for that and other purposes, and could no longer enjoy the same as of right he should and ought to do.

The second count set forth the ownership by the plaintiff of his lands described, and that he had used and had "and ought to use and have the benefit of a certain stream of water, or water course, which extends itself through divers parts and parcels of the said land;" and charged that the defendant "the stream and course of water aforesaid, did dam up, stop, obstruct and from its ancient course in which it used to run, did divert and cause to be diverted."

Special pleas were filed by the defendant.

At the trial on January 14, 1886, it was shown that by the act of March 9, 1771, 1 Dall. L. 553, it was provided that the rivers Delaware and Lehigh and parts of Neshameny creek, should be common highways, for the purposes of navigation, and, by § 4, that no person should "presume to divert, lead or draw at any time or times, by any race or other device, any water of the said rivers or either of them out of or from its natural course or channel, for the use of any mill or water works." By act of February 27, 1798, 3 Sm. L. 311, the gov-

ernor was authorized to incorporate a company for the purpose
of improving the navigation of the river Lehigh. The same
authority was again given by the act of March 22, 1814, 6 Sm.
L. 180. By § 8, act of February 13, 1822, P. L. 21, it was
provided that the Lehigh Coal and Navigation Company " shall
have the privilege, and be entitled to use all the waters of the
said river, sluices, canals, and other devices, to propel such
machinery as they may think proper to erect on the land they
may previously have purchased from the owner and owners, or
to sell in fee simple, lease or rent for one or more years the
said water to any person or persons, to be used in such man-
ner and on such terms as they may think proper: Provided, it
be so done that it will not at any time interrupt or impede
navigation."

The plaintiff introduced evidence to show that though he
had never procured a lease from the Lehigh C. & N. Co., yet
negotiations had been pending for some time to that end, and
that company had knowledge of his use of the stone-row dams
erected by him. He also introduced evidence of malice on the
part of the defendant.

The nature of the contest being shown by the narr and the
legislation referred to, the facts and the questions which arose
sufficiently appear from the charge to the jury, ALBRIGHT,
P. J.:

It appears that at the time this suit was brought, and for
many years before that time, the plaintiff was the owner of a
piece of real estate in the borough of Slatington, on the shores
of the Lehigh river; that on it he had a factory for the manu-
facture of articles from slate, which was at one time operated
by water power derived from the Lehigh river alongside of his
manufactory. In September, 1882, Mr. Fulmer, the defendant,
became the owner of a tract of land, also on the banks of the
Lehigh river, adjoining the tract of Mr. Williams on the north,
which is up the stream. On that tract there was at that time,
and had been for years previously a slate quarry. The rub-
bish from the quarry was deposited between the quarry and
Lehigh river. The plaintiff alleges that the defendant, after
he became the owner of the slate quarry property and before
the bringing of this suit deposited rubbish from the quarry,

Charge of Court below.

consisting of earth, stones and offal of the slate, into the Lehigh river, and thus obstructed the flow of the water, and impaired and in part destroyed the water power, which the plaintiff had enjoyed there before.

It appears that the portion of the Lehigh river, which specially comes into question here, is a branch or arm of it, which flows between the shore at Slatington and an island which is in the river there. The plaintiff's property is directly opposite the island, and that of the defendant is partly opposite it. The alleged dumping place is perhaps nearly opposite the head of the island, and the defendant's land extends further up the stream. It appears that the main channel of the Lehigh river is on the east side of the island. The plaintiff has shown that he is also the owner of the island, but I do not see now that that ownership by him will affect the case as presented; still it can be borne in mind and perhaps will enable you to understand certain portions of the testimony better than you otherwise could do.

Under the law the rights of these parties are different from what their rights would be if their land was upon an ordinary stream of water, which flows through people's land. The Lehigh river more than a hundred years ago was declared to be a public highway, and by the same enactment persons were prohibited from taking any water out of the stream for mills or water works. Ordinarily, where one man owns land on one side of a stream, and the stream is a boundary of his land he owns to the centre of that stream, but in the case of a public highway, such as the Lehigh river, the rule is different. The stream itself being a public highway belongs to the public. It appears that somewhere about the year 1822 the state, by legislative enactment, granted to the Lehigh Coal and Navigation Company the right to improve and navigate the Lehigh river, and also granted them the right to the use of the water for water power purposes. That corporation is still a living corporation, and exercises rights over the Lehigh river.

In the case of a navigable stream, the man who owns land along the stream, and whose land is described as bounded by the stream has absolute title to high-water mark, and between high- and low-water mark he has a qualified title to the ground. Between high- and low-water mark he has a right to the land

subject to the right of the public, and by that is meant the
right to navigate the stream.   It is not unlawful for one who
owns land on the shores of the river to make use of the ground
between high- and low-water mark, (at least not as against any
other private citizen who complains,) unless it appears that
such use of the space interferes with the navigation of the
stream.   The use of the ground between high- and low-water
mark, as it is said the plaintiff made of it, (and it seems the
defendant also made use of it by dumping into the stream,)
cannot be made a ground of complaint here, because neither of
these individuals, as private citizens, can complain of that, and
the commonwealth is not complaining of it, nor is the naviga-
tion company complaining of it.   Hence we say to you, that
as against the defendant the plaintiff had a right to the river
and its bed between high- and low-water mark, and any bene-
fit or advantage that was to him, or any right of property he
had in that, he was entitled to as against Mr. Fulmer the de-
fendant.   On the other hand we say to you, that so far as Mr.
Fulmer dumped into the stream, not beyond low-water mark,
he cannot be held liable for it in this action, even if that did
affect the water power of Mr. Williams.   And then, inasmuch
as neither the state nor its grantee, the navigation company,
conferred upon Mr. Williams the power to erect a dam or
dams in the Lehigh river, it must be held that he had no prop-
erty in the dam, nor in the water power which the dam or
dams created.   The dam at the factory of the plaintiff extend-
ed across the arm of the stream, and that arm is also a public
highway, and necessarily, if it was beyond low-water mark he
had no property in it; the row of stones which was thrown
up from the head of the island by Mr. Williams, part way
across to the east shore, in that also he had no vested right,
because it is in the stream, which is a public highway.

The claim of the plaintiff here, so far as this right is con-
cerned, is, that the defendant by dumping rubbish into the
stream beyond low-water mark interfered with the flow of the
stream, so that the use of the water as a water power, which
the plaintiff might have made of the water between high- and
low-water stage, was interfered with.   When we speak of high-
and low-water mark we mean the elevation of the water at
ordinary stages of high- and low-water.   By low-water mark is

Charge of Court below.

not meant the lowest stage of the water in great drought, but it means the height of the water along the shore when the water is at an ordinary stage; and by high-water mark is meant the line to which it extends where it is ordinarily high, and does not mean the greatest freshets that may occasionally occur.

Has the plaintiff satisfied you from a description of his ground and the shore as it is there, or was there, at the time this suit was brought, that the flow of the water between high- and low-water mark was of value to him as a water power. Of course, it would not be valuable when the water was low, because then there would be no water in that space, but it might be that when the water was higher it was of use to him. It may be that the water there between high- and low-water mark would not furnish a power at all seasons, but only at some seasons, and if it did so it was of value to the plaintiff then. It was explained to you how the shore shelved at that point directly opposite the plaintiff's factory. The bank there, or just above, I believe is rather abrupt, but at one point there is a slate rock, as I understand the testimony, shelving out into the stream, and I believe it is said there was a natural flow or ripple there; that a bed of slate extended across the stream. From the description of the property there, you will determine whether it is proved that the water power which was valuable between high- and low-water mark existed and was of value to the plaintiff. If that is not shown then the plaintiff has not established that any right of his was invaded. In that event you would find a verdict in favor of the defendant. If you find that there was a water power there in the way I have mentioned, and that it was of value, and that the defendant by dumping refuse into the stream beyond low-water mark deprived the plaintiff in whole or in part of that right and property, then the plaintiff is entitled to recover. . .

The contention of the defendant is that the plaintiff had no water power or anything else of value along his property between high- and low-water mark; and in the second place he contends that there was nothing done by the defendant which interfered with the plaintiff's right, if he had one. It is contended that there was no material filling in of the stream by Fulmer in his time, and it is further contended that if there

was, it had been partly filled in by Williams, while he still owned the property, because he owned it before Fulmer obtained it, and that therefore the defendant ought not to be held liable. When you reach this point you will, of course, consider whether there was a filling in by the defendant beyond low-water mark, because as I have already said to you, to the extent of low-water mark he had a right to fill in, so far as Mr. Williams is concerned. . . . . .

If you conclude the plaintiff is entitled to a verdict, you will consider how much the plaintiff's property up to the time suit was brought was worth less than it would have been but for the unlawful acts of the defendant. If you find that the injury to his property was permanent, you may also consider what it would cost to remove the rubbish, which the defendant placed into the stream unlawfully beyond low-water mark, out of the stream, and to give the plaintiff the benefit of the water as he had it before, and as he may have been entitled to it; and if you do find for the plaintiff you will find for him the lower of these two sums.

In the opinion of the court, if the plaintiff is entitled to recover in this case, he is entitled to recover only as much as will compensate him for his damages occasioned by the defendant, or that will make him whole. In certain actions of tort, trespasses, and the like, a jury may in addition to awarding to the plaintiff that which will compensate him add a further sum as punishment, which further sum awarded as damages is what we call in law exemplary or vindictive damages. It has been argued here that the defendant acted recklessly and maliciously, and in disregard of the plaintiff's right, with the intent to injure him, and that from that you might infer, gentlemen, if you find for the plaintiff, that you might add a sum to punish the defendant. The act done by the defendant, if he did an unlawful act, was the making or erecting of what we call a public nuisance; that is, he put that which worked harm and inconvenience into a public highway,—the Lehigh river,—and for that act, if it was unlawful, he could be punished in a public prosecution on the complaint of the commonwealth. Any private citizen, who has special injury and who can show special damages, may bring a suit against the wrong-doer in such a case, but in the opinion of the court he

can recover only the damages actually sustained, and if there is to be a punishing of the wrong-doer, that punishment must be inflicted in a suit by the public and not by a private individual. But where there is a public nuisance committed and any citizen can show that he had special damages in consequence of a wrong act, he may recover for that injury. And so as these questions affect the plaintiff's case, I say to you that if you find that the defendant did that which was unlawful by obstructing the Lehigh river beyond low-water mark, and that David Williams was specially damaged, and he has shown what those damages are, he may recover them in this action.

The points which have been submitted by counsel are numerous and refer to many phases of the case so far as the law is concerned, and it is believed that after the points have been read and answered, they together with this charge, will be all the instructions you require.

[Perhaps another matter that ought to be referred to, is, that if you should find that the plaintiff is entitled to recover; that the injury to his real estate up to the date suit was brought was permanent, and that you will adopt the damages to his factory and real estate as the measure of damages, then you should be cautioned as to how to view the evidence on that point. You would then consider, if the plaintiff had any rights to the water power there, under the law as it has been stated to you, that it affected the value of the manufactory, and consequently the real estate on which it was located. If you come to consider the amount of the damages estimated upon that basis, then you will consider how much the property was worth in the market at a fair sale affected by the injury, and how much it would have been worth at the same time if the injury had not been done. You are not to consider as a rule for estimating the damages purely how much it would cost per day or per year for an engineer, and to buy the fuel, which it seems was done after the water power is alleged to have failed; but you are to consider and find, if you reach that point, and if the evidence gives you the data to find it from, how much the factory and real estate of the plaintiff was worth in the market at a fair sale less than it would have been were it in the same condition as it was before.] [12]

The plaintiff requests the court to charge the jury [inter alia] :

1. As the owner of a tract of land adjoining the Lehigh river, the plaintiff's title is absolute to high-water mark. Between high- and low-water mark he owns the soil subject to the right of the public to pass over it for purposes of navigation when the space is covered with water. He has the right to use this space for all lawful purposes that do not interfere with the rights of navigation. Owners or occupiers of land, above or below, have no right to place obstructions in the stream below ordinary low-water mark that will operate to divert the waters from that part of his land which lies between high- and low-water marks. If by such unlawful obstruction, and as a direct consequence thereof, an injury is done to such other riparian owner, and he suffers special damages, beyond the mere injury to the public, he can maintain an action and recover for the special damages suffered by him.

Answer: Affirmed.[1]

\*    \*    \*    \*    \*    \*    \*    \*

The defendant requests the court to charge the jury [inter alia] :

1. The title to the water and soil of the Lehigh river below low-water mark is in the commonwealth, and the plaintiff cannot maintain an action for any encroachment upon them, or obstruction to the navigation of said river, unless he has averred and proved some special, particular damage resulting from the violation of his legal rights in the obstructed highway.

Answer: Affirmed.

2. The plaintiff, by reason of being the owner of the bank of the Lehigh river, has no property or special interest in the waters of said river. He does not, from the mere circumstance that he is the owner of part of the bank, acquire any special or particular interest in the stream, over any other member of the public. To him riparian ownership brings no greater rights than those incident to all the public.

Answer: Negatived.[4]

3. As the plaintiff has no special individual property in the waters of the Lehigh river, and as the right to have the water of said river flow along his lands is not an appurtenance to his title as owner of the bank, he has no legal right to have the

Charge of Court below.

water flow along his property; and if such ordinary flow of the water is impeded or obstructed he cannot maintain an action therefor, unless he can show that his use of the river as a navigable highway has been interfered with by the defendant. There being no such evidence in this case the verdict must be for the defendant.

Answer: Negatived.[5]

6. The test of nuisance is not injury and damage simply, but injury and damage resulting from the violation of a legal right of another. Before, therefore, the plaintiff can recover he must establish, by the weight of evidence, that he had a right to and in the waters of the Lehigh river as a public navigable highway, and that the defendant has done some act that interfered with his use and enjoyment of the same as a public highway.

Answer: Negatived; this proposition seems to exclude his rights between high- and low-water marks, and to confine his interest in the stream to purposes of navigation.[6]

7. The obstruction of a navigable river is a public not a private wrong; such obstructions may affect those near it more than the rest of the public; but the damage sustained by those near it differs in degree only, not in kind. It is a wrong, therefore, (if it be one,) to be redressed by a public prosecution, not by recovering damages in a private action.

Answer: Negatived.[7]

15. If the defendant encroached upon the bed of the Lehigh river, below low-water mark, by dumping rubbish in it from his quarry, no one but the state can complain of it, unless they can show that their use of the river as a public navigable highway has been obstructed and interfered with.

Answer: Negatived; this proposition seems to confine plaintiff's interest in the stream to purposes of navigation.[10]

The verdict of the jury was in favor of the plaintiff for $6,831.81. A rule for a new trial having been discharged, judgment was entered, when the defendant took this writ and assigned as error inter alia:

1. The affirmance of plaintiff's 1st point.[1]
4–7. The refusal of defendant's points.[4 to 7]
10. The refusal of defendant's 15th point.[10]
12. The part of the charge embraced in [ ] [12]

Arguments.

*Mr. Edward Harvey,* for the plaintiff in error:

1. The common law doctrine that fresh-water rivers, in which the tide does not ebb and flow, belong to the riparian owners has never been applied to the large rivers of Pennsylvania. Such rivers are navigable, though there is no ebb and flow of the tide, and they belong to the commonwealth: Carson v. Blazer, 2 Binn. 475; McKeen v. Canal Co., 49 Pa. 424; Rundle v. Canal Co., 14 How. 80; Shrunk v. Navigation Co., 14 S. & R. 71; Baker v. Lewis, 33 Pa. 301; Flanagan v. Philadelphia, 42 Pa. 219; 3 Kent, Com., § 427; Martin v. Waddell, 16 Pet. 410; Monongahela Bridge Co. v. Kirk, 46 Pa. 112; Dalrymple v. Mead, 1 Gr. 197.

2. The title of riparian owners on navigable streams extends no further than the banks of the streams: Shrunk v. Navigation Co., 14 S. & R. 71. The grants of the state, on such streams, are limited by low-water mark: Hart v. Hill, 1 Wh. 137; Ball v. Slack, 2 Wh. 508; Leh. V. R. Co. v. Trone, 28 Pa. 206; Jones v. Janney, 8 W. & S. 436; and the grant of title is not absolute except to high-water mark: Stover v. Jack, 60 Pa. 343; Poor v. McClure, 77 Pa. 218; Bailey v. Miltenberger, 31 Pa. 37; Commonwealth v. Fisher, 1 P. & W. 462. The shore owner has no right to make any erection between high- and low-water mark without express authority from the state: Tinicum Fishing Co. v. Carter, 61 Pa. 21; his title does not include islands opposite his lands, unless the state has conveyed them according to law: Wainwright v. McCullough, 63 Pa. 66; he is entitled to no rights either in the shores or the waters, as an incident of his ownership, except the contingent ones of alluvium and dereliction: Tourlin v. Railroad Co., 32 Ia. 106 (50 Amer. R. 649); Gould v. Railroad Co., 6 N. Y. 522; Lansing v. Smith, 8 Cow. 146; Bigler v. Antes, 21 Pa. 290; Naglee v. Ingersoll, 7 Pa. 201.

3. From the cases cited, the following conclusions are drawn: Riparian ownership upon navigable streams, brings no greater rights than those incident to all the public, except access to the channel of the river, and wharfage to low-water mark. Any diminution of the ordinary flow of the river, or any diversion of its waters, not obstructive to the navigation of the stream, or destructive of its use as a navigable highway, is not actionable at the instance of a private party. Riparian owners cannot

use the waters of a navigable river as power to run a mill, without express authority from the state or its authorized agents. It follows, that the court erred in affirming the plaintiff's first point, which assumes that a riparian owner has a property in the waters of a navigable river flowing above ordinary low-water mark.

4. According to uncontradicted testimony, the alleged obstruction, extending twenty-five or thirty feet beyond the shore into the stream, did not interfere with the navigation of the river. Nor was it alleged in the pleading or proved at the trial that it shut off access to the navigable parts of the river from the plaintiff's land. The defendant had the same rights as the plaintiff, but it is not pretended that as against the state or its grantee, the Lehigh Navigation Co., the defendant had the legal right to dump into the river. If he dumped into it so as to obstruct navigation, he would be guilty of maintaining a nuisance, which could be abated only by proceedings at the instance of the public, and if it appeared that such encroachment did not interfere with navigation, there could be no conviction: Zug v. Commonwealth, 70 Pa. 138; Gould on Waters, § 21; Hargrave's Law Tracts, 85. The fifteenth point should have been affirmed.

5. The narr charged the diversion of the water from its usual course to such an extent that the plaintiff could no longer operate his factory by water power as he was wont to do. He had built a stone-row dam extending some distance northeast from the upper end of the island, and another between his factory and the island. The factory was run by a turbine wheel with the power produced by these dams, and this was the power alleged in the first count to have been interfered with by the defendant; the second count had been eliminated by the court. Particular damage was the gist of the action and must be specifically set out in the pleadings: Gould on Waters, § 122; 2 Greenl. Ev. § 254; Sartwell v. Wilcox, 20 Pa. 118; Stump v. Hutchinson, 11 Pa. 533; Scott v. Horn, 9 Pa. 407; Stewart v. Kelly, 16 Pa. 161; Clark v. Partridge, 2 Pa. 13; Hunter v. McHose, 100 Pa. 38; Baker v. Boston, 12 Pick. 184 (22 Amer. D. 421). It is essential to aver and prove special damage: Mechling v. Kittanning Bridge Co., 1 Gr. 416; Georgetown v. Canal Co., 12 Pet. 98; Black v. Railroad Co., 58 Pa. 252. But

Arguments.

by the plaintiff's narr the special damage was the interference with his water power as he was wont to use it. The court charged that for any interference with the power obtained by the dams, the defendant was not liable, for the plaintiff had no right to maintain them. What then could the plaintiff claim to be entitled to recover?

*Mr. R. E. Wright* (with him *Mr. D. D. Roper* and *Mr. J. Marshall Wright*), for the defendant in error:

1. Have riparian owners, on navigable streams in Pennsylvania, any rights in relation to any part of the stream, by reason of their ownership of adjoining lands, as against other riparian owners? Can the upper owner pollute the water that passes my land and poisons my cattle, render it useless for all purposes, and then escape on the plea that the river is a public highway? Can he so use his land as to change the course of the stream and flood my land? Can he divert the water from my land and leave its shores bare, or change an ample free flowing stream into a mere trickling useless rivulet? The plaintiff in error says, yes; he can do anything in respect to the river no matter how it affects the condition of my property, provided he does not interfere with my " navigating " it. In short the contention is, that the riparian owner on a navigable stream has no rights in respect to it save the rights of navigation and fishery. Fortunately there is no authority for any such doctrine. The law is to the contrary: Gould on Waters, 275–8; Wood on Nuisance, 647–9, 698–9. Except as qualified and restricted by the public right of navigation and fishery, the owners of land along navigable rivers have all the ordinary rights of riparian owners.

2. The rule in Pennsylvania is undoubtedly this: The owner is the absolute owner of the land to high-water mark; between high- and low-water mark his title is qualified. He owns the land subject to the right of the public to pass over it for purposes of navigation when it is covered with water; subject to and affected by this right of navigation, he owns this strip as absolutely as he can own his dry land. He can use it for any and every lawful purpose that does not interfere with the paramount public right of navigation: Zug v. Commonwealth, 70 Pa. 141; Ball v. Slack, 2 Wh. 508; Leh. V. R. Co. v. Trone,

Opinion of the Court.

28 Pa. 206 ; Bailey v. Miltenberger, 19 Pa. 37 ; McKeen v. Canal Co., 49 Pa. 440 ; Stover v. Jack, 60 Pa. 339 ; Wainwright v. McCullough, 63 Pa. 73 ; Wood v. Appal, 63 Pa. 221 ; Poor v. McClure, 77 Pa. 219 ; Hartley v. Crawford, 81* Pa. 486 ; Kreiter v. Bigler, 101 Pa. 101.

3. The land owner having these undoubted rights, others cannot invade them with impunity. The defendant filled up the channel with a permanent deposit of thousands of tons of rubbish so that, where before was a steady stream of water eighty feet wide and at one side from four to five feet deep, little if any water flowed. The act was without pretence of excuse, and was unquestionably a public nuisance, resulting in special damage to the plaintiff : Gould on Waters, § 92 ; Reynolds v. Clarke, 1 Crum. 9 ; Dubois v. Glaub, 52 Pa. 242 ; Black v. Railroad Co., 58 Pa. 249 ; Pittsburgh v. Scott, 1 Pa. 309 ; Hughes v. Heiser, 1 Binn. 463 ; Wood on Nuisances, 656–7, 675, 681–2, 687 ; Attorney-general v. Lonsdale, L. R. 7 Eq. C. 390.

4. As to the measure of damages : The court charged the jury to adopt the lowest measure; that there could be no punitive damages ; that they must throw out of consideration the fact of the value of plaintiff's dams across the stream and the possibility of securing a grant from the navigation company; and they should regard only the injury done to the plaintiff's rights between high- and low-water marks, adopting the rule of Seely v. Alden, 61 Pa. 302. The verdict rendered was for an amount lower than the lowest sum testified to by any witness in the cause.

OPINION, MR. JUSTICE WILLIAMS :

The plaintiff below is the owner of land lying on the west bank of the Lehigh river, on which he has a factory for the making of school slates. The machinery has for several years been propelled by the water of the river. Directly opposite the plaintiff's factory is an island, between which and the west bank of the river flowed a stream which, in ordinary stages of water, was about eighty feet wide and from four to five feet deep. Across this channel the plaintiff had built a dam high enough to raise the water about one foot above its ordinary level, and this furnished his water power. The main stream

of the river passed along the east side of the island.    The defendant below, Fulmer, owned land on the bank of the river adjoining and next above the land of the plaintiff.    He operated a slate quarry, and the plaintiff alleged and the jury has found that he has filled the stream, from his own land opposite the head of the island, many feet beyond low-water mark, with the débris from his quarry, until he has in effect diverted the water of the river from the plaintiff's land and destroyed his water power, the water now passing on the east side of the island.    The evidence shows quite clearly that the filling up of the channel below low-water mark was done with a deliberate and freely expressed purpose to depreciate the value of the plaintiff's property and to destroy his water power.

The Lehigh river is a navigable stream, a public highway. The plaintiff had no grant from the state or its grantee, the Lehigh Navigation Company, of the use of the water for any purpose.    The defence set up the public character of the river and denied that the plaintiff had a title to the water power as riparian owner or otherwise.    The court instructed the jury that the plaintiff had no title below low-water mark, but that between low- and high-water marks he was the owner of the soil, and, subject to the right to navigate the stream by the public, he had a right to use the water; and that he could recover for the destruction of the power so far as it grew out of the water flowing above low-water mark.    The assignments of error are seventeen in number, but the case presents two principal questions : first, what are the rights of a riparian owner on the shore of a navigable stream between high- and low-water marks ? second, what are the rights of such owner in the water flowing over this strip of shore ?    Both questions require to be considered : (1) As between the riparian owner and the public.    (2) As between him and other riparian owners.

In the British Islands the rivers are inconsiderable in volume and of little value for purposes of navigation except where they are affected by the ebb and flow of the tide.    From this it resulted naturally that royal or public streams, the bed of which belonged to the Crown, came to be distinguished from private streams, the beds of which belonged to the owners of the banks, by reference to the presence or absence of tide-

water.   On this continent the early settlers found large rivers
with navigable tributaries, forming · vast systems of internal
communication, extending hundreds and in some instances
thousands of miles above the reach of tide-water.   The com-
mon law definition of a navigable river was unsuited to this
state of things, and seems never to have been adopted in
Pennsylvania; on the contrary, navigability in fact was made
the test by which the character of a stream, as public or pri-
vate, was determined, and the great but tideless rivers of the
state were held to be navigable rivers, public highways, be-
longing to the state, and held for the use of all her citizens.
The beds of such rivers, between the lines of ordinary low
water, on their opposite sides, have not been granted out by
the commonwealth to individuals, but continue to be held and
controlled by and for the public: Carson v. Blazer, 2 Binn.
475; Flanagan v. City of Phila., 42 Pa. 219.

A grant of land bounded upon a stream not navigable extends
usque ad filum medium aquæ; but a grant of land bounded
upon a navigable river extends to ordinary low-water mark
only.   Between this line and high-water mark, the land of the
grantee is, by the nature and necessities of the situation, sub-
ject to a servitude in favor of the public.   The stream must
run within its natural banks after as well as before the ·grant.
The grantee takes subject to the rights of the public in and
upon the highway, and as between him and the public he
may use his land below the line of high water for such pur-
poses only as do not interfere with the free flow and naviga-
tion of the water that flows over it.   As to neighboring
riparian owners, the manner in which he may use the shore
becomes a question of private right.   While, as citizens, they
are all entitled to the unobstructed use of the highway, as
individual owners of land along the stream, they are clothed
with the rights and are subject to the duties that grow out of
their ownership and their neighborhood.   The maxim, sic utere
tuo ut alienum non lædas, is as clearly applicable to their
water fronts as to their back lands.   If a riparian owner places
a structure upon his own land between high- and low-water
marks that impedes navigation, he infringes the public right,
and subjects himself to liability therefor.   His ownership of
the land over which the water flows along the shore, will not

relieve him from the consequences of his act, for his title to the shore is subject to the right of the public in the stream. If he places the structure in such manner as to throw the current against his neighbor's shore at such an angle as to wear it away and undermine and wash out his land, he inflicts a private injury upon his neighbor for which a right to compensation exists. In the case of a private stream, no one would doubt the right of an injured owner to maintain an action for the damages suffered by him by reason of a change in the current. But one has no more right to injure another with the water of a navigable stream than with that of a non-navigable, private stream. It is not the character of the stream, but the character and consequences of the act of the owner of the shore that determines the right of the injured party to compensation. As between themselves, riparian owners are owners of the soil, and are bound to observe the obligations that grow out of their ownership and their proximity. In Zug v. The Commonwealth, 70 Pa. 138, it was held that an owner of the soil might use the river-bed between high- and low-water marks for his own private purposes if he did not interfere with the rights of the public. This declaration is, however, to be understood as qualified by the rule we have just considered, that he must not, in the exercise of his right as a riparian owner, inflict injury upon his neighbors. This rule sets limits to the manner in which property of every description may be used, and is unaffected by the accident of location.

We come now to our second question, viz.: What rights has a riparian owner in the water of a navigable river flowing between high- and low-water marks? The water of a stream is not the subject of ownership in the ordinary sense of that word. If one is the owner of the land over which a stream flows, he is entitled to the use of the water because of his ownership of the bed in which it flows. He may not retain the water upon his land indefinitely or divert it from its natural channel or sell it to be removed; but, subject to the reasonable use of the water by him, lower owners have a right to the stream and he must deliver it to them. In the case of all navigable rivers the beds in which they flow belong to the public. The right to the use of water follows the ownership of the bed in which it flows. The commonwealth is therefore the owner of the rivers and

holds them for the use of its citizens. They are public property—natural highways—open to all who may have occasion to use them: Carson v. Blazer, supra; Poor v. McClure, 77 Pa. 214. When the volume of the stream swells in time of high water, its surface remains the surface of the highway and the riparian owner must do nothing that shall interfere with the use of the highway or any part of it by the public up to the line of high water. The fact that the water of the highway flows over his land, when it rises above low-water mark, gives him no title to it, for he holds his shore subject to this servitude in favor of the public. The stream is not divisible by the lines of riparian owners or susceptible of divided and hostile ownership, but is the same public highway in all stages of water, and belongs in all its breadth and depth to the public. The owner of the shore having no ownership in the water has as between him and the commonwealth no greater right in it than any other citizen. He has no right to erect a dam to turn the water to his mill without a grant from the commonwealth of the right so to do, and if he erects such dam without a grant he is a trespasser and acquires no title to the water power resulting therefrom. He stands in the same position as an intruder upon a public road, without right, and liable to removal at any moment. He has an indisputable right as a citizen to the use of the river as a public highway, but as a riparian owner he has no right to obstruct its flow, or to divert its waters except for domestic purposes and, within certain limits, for purposes of irrigation. If he does erect a dam and turn the water to his mill he, ordinarily, infringes the public right only. For such infringement he is liable to the public, and his dam may be abated as a nuisance. But such use of the water is not necessarily an injury to other riparian owners, as such, especially to those who, like the defendant in the court below, are further up the stream. If the navigation is unobstructed, it is not easy to see what reason the owners living up the stream have for objecting to the use of the water as a power. The state, as the owner of the river, may object, and between her and the mill-owner the question is one of property as well as one of interference with the right of navigation. The mill-owner must buy the power, if he would use it safely. Without such grant he is a trespasser upon the property of the public, and an ob-

structor of the public way.   But to justify an objection by a
neighboring riparian owner, as such, he must be able to show
that he has suffered a private injury from the acts of the mill-
owner.

Applying these principles to the case now before us, it is
clear that the plaintiff was allowed to recover for what did not
belong to him.   He had no title to the water, whether above or
below low-water mark, and he could have no legal right to the
power resulting from the erection of his dam.   Its destruction
was, therefore, damnum absque injuria.   The fact that he was
intending to acquire a title to the water power from the grant-
ees of the commonwealth is quite immaterial.   He had not in
fact done so, and he had no better title to this water power
than he had to any other property of the navigation company.
The action was brought to recover for the loss of a power to
which he could show no title, because he had none.   It was
not the case of an undershot wheel moved by the current in
time of high water, but of a mill or factory provided with power
by an unauthorized and illegal obstruction of the natural cur-
rent, which could have been removed at any moment by the
public authorities, or by the grantees of the commonwealth.

But while the plaintiff in the court below may not recover
damages for the loss of the water power which was not his, we
do not think he is without a remedy for such injury as he has
actually suffered.   Upon suitable averments he may recover
for the damages he has sustained, as a riparian owner, from the
illegal acts of his neighbor.   The evidence shows that Fulmer
has obstructed the stream far beyond low-water mark, and
practically closed the channel between the island and the west
shore.   This deprives Williams of convenient access to and use
of the current for many legitimate purposes.   This has not
been done under the authority of the commonwealth, or by an
exercise of the right of eminent domain, but in obvious disre-
gard of the rights of the public, as well as those of his neighbor.
It appears by the evidence to have been done for the purpose
of compelling his neighbor to resort to steam power for his fac-
tory, and to deprive him of the use of the water.   Such inva-
sion of the bed of the stream was an unlawful act, and if, in
consequence of it, Williams was deprived of convenient access
to the river, for purposes of navigation, for fishing, for domestic

or other proper purposes, he is entitled to recover damages for the injury sustained. It is not as a mill-owner, but as a land-owner, that he has suffered by being deprived of the conveniences which resulted from his riparian ownership, and which, as between him and his neighbor, were his own.

If the unlawful act from which he suffers was done with malice, proof of the malice is competent upon the question of damages.

What Fulmer said in reference to the filling of the stream, its effect upon Williams, and his own motives or purposes, is competent for the purpose of showing malice, and was properly received on the trial. As the case stood, however, in the court below, the narr set out the loss of the water power and that only as the cause of action, and for that the plaintiff was not entitled to recover.

> Judgement reversed, and venire facias de novo awarded.

GORDON, C. J., and STERRETT, J., dissented.