## MILLS et al. v. UNITED STATES.

*(District Court, S. D. Georgia. July 17, 1891.)*

1. CONSTITUTIONAL LAW—TAKING PRIVATE PROPERTY FOR PUBLIC USE.
   For the purpose of improving a navigable river the government erected a dam, which raised the level of the river, and thus prevented the owner of adjoining rice fields from draining his canals into the river between high and low water marks, as he had previously done, but did not actually invade his premises. *Held*, that the injury to the rice fields did not constitute a taking of private property, within the meaning of the constitutional prohibition against taking private property for public use without just compensation.

2. NAVIGABLE WATERS—RIPARIAN RIGHTS.
   The Savannah being a navigable stream, the rights of the plaintiffs in the ebb and flow of the tide are subordinate to the control of the government, for purposes of navigation; and it having determined that the current shall be confined for the purpose of scouring and deepening the channel, an injury resulting from an elevation of the flow of the tide, which prevents the discharge of the plaintiffs' canals between high and low water mark, is *damnum absque injuria.*

3. JURISDICTION—CLAIMS AGAINST THE GOVERNMENT.
   Act Cong March 3, 1887, (24 St. at Large, p. 505,) which gives the federal courts jurisdiction of actions against the government for claims upon contracts or for damages in cases not sounding in tort, does not give them jurisdiction of an action against the government for an alleged wrongful diversion of a water-course, since that is an action sounding in tort.

At Law.

*Lawton & Cunningham,* for plaintiffs.

*Marion Erwin,* U. S. Atty.

Before PARDEE and SPEER, JJ.

SPEER, J. The plaintiffs filed their petition under the provisions of the act of congress of March 3, 1887, (24 St. at Large, p. 505,) to recover from the United States compensation for injury to the value of their lands caused by the erection of works by the government, for the improvement of the navigation of the Savannah river. The petition avers that the plaintiffs owned rice plantations on Hutchinson's island, in the Savannah river, and on the main-land opposite. These lands have been prepared at large expense for the purpose of rice cultivation, and have their chief value because of that fact. It is essential to the cultivation of rice on such plantations that there shall be a system of canals both for flooding and draining the rice fields. The lands in question were drained into the front river—that is, the river proper—prior to the acts on the part of the government complained of. The bottoms of the plaintiffs' ditches and the sills of the trunks and flood-gates were above low-water mark, their system of drainage was complete; and it is complained that the erection by the government of what is called the "cross-tides dam," running from the upper end of Hutchinson's island to the lower end of Argyle island, cuts off all the flow of water from the stream connecting front and back rivers, has raised both the high and low water levels in front river, and has not only destroyed the facilities for draining these lands into front river, but has rendered it necessary to raise the levees around the rice fields, to prevent flooding the fields at high water. This,

it is alleged, has unfitted the lands for rice culture, and makes it necessary that new drainage into back river be provided where the water levels are suitable. The expense of doing this will amount to $10,000, and plaintiffs insist that they are thus damaged to that extent. This cross-tides dam was erected by the United States as a part of a system of harbor improvements, with the full knowledge of the fact that the drainage of plaintiffs' land would be thus impaired and destroyed. The case of the plaintiffs depend upon the following proposition: (1) The action of the government officials in erecting the cross-tides dam amounts to a taking of their property for public use without just compensation. (2) The right of drainage into the river is appurtenant to the land, and has been taken in the same manner. (3) The government by taking this property entered into an implied contract for the compensation of complainants. (4) Their right to this compensation is a claim arising under the constitution of the United States; and (5) also under an act of congress, to-wit, the act authorizing harbor improvements.

The defendant demurred to the petition upon the grounds: (1) That the plaintiffs have not set forth a cause of action against the government. (2) In so far as it is set forth, it is an action *ex delicto*, and of actions against the government sounding in tort the court has no jurisdiction. There are other grounds, but the decision must depend, in our opinion, upon the grounds stated.

The material clauses of the act of congress under which it is sought to maintain this suit confers jurisdiction on the court of claims to try—

"(1) All claims against the United States founded upon the constitution of the United States or any law of congress, except for pensions, or upon any regulation of an executive department, or upon any contract, expressed or implied, with the government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty, if the United States were suable: provided, however, that nothing in this section shall be construed as giving to either of the courts herein mentioned jurisdiction to hear and determine claims growing out of the late civil war, and commonly knows as ʻwar claims,ʼ or to hear and determine other claims which have heretofore been rejected or reported adversely by any court, department, or commission authorized to hear and determine the same.

"(2) That the district courts of the United States shall have concurrent jurisdiction with the court of claims as to all matters named in the preceding section where the amount of claims does not exceed one thousand dollars; and the circuit court of the United States shall have such concurrent jurisdiction in all cases where the amount of such claim exceeds one thousand dollars, and does not exceed ten thousand dollars. All causes brought and tried under the provision of this act shall be tried by the court without a jury." 24 St. at Large, p. 505.

It appears from these provisions of the statutes that the government has, with somewhat unusual magnanimity, opened the portals of its courts to a very large class of litigants having claims against it. It is equally observable that certain marked and distinct limitations, upon this enlargement of the jurisdiction of the courts, were defined. It will

be obvious, also, that it was not the purpose of this legislation to create new causes of action, but merely to provide a convenient forum for the adjudication of certain specified controversies.

The first, and the more important inquiry presented by the demurrer is this: The jurisdiction being granted, do the facts set out in their entirety constitute a cause of action between plaintiffs and the government? The entire declaration, with the bill of particulars must be considered in order to determine this question; otherwise a very partial, and, indeed, imperfect, view of the claim may be formed, and the questions are of importance, in contemplation of the extensive and generous appropriations annually made by the national legislature for the improvement of navigation, and the great volume of litigation which may depend upon the decision of cognate questions. It is insisted by the plaintiffs that the action of the government constitutes a taking of their property without just compensation, in violation of the fifth amendment of the constitution, which provides: "Nor shall private property be taken 'for public use without just compensation." Do the averments show a taking of private property for public use, in the meaning of this provision of the constitution? In the case of *Transportation Co.* v. *Chicago*, 99 U. S. 640, decision by Mr. Justice STRONG, for the court, a statement of the law fundamental to this inquiry will be found. In that case the action was to recover damages for injuries alleged to have been sustained by the plaintiffs in consequence of the action of the city authorities in constructing a tunnel or passage-way under La Salle street, and under Chicago river where it crosses that street. The plaintiffs were the lessees of a lot, bounded on the east by the street and on the south by the river, and the injury of which they complained was that, by the operations of the city, they were deprived of access to their premises both on the side of the river and of the street, during the prosecution of the work. It is true in that case it was not claimed that the obstruction was a permanent one, and it appeared, as in the case now before the court, that there were no averments that the works were unnecessary. They were indeed indispensable for the construction of the tunnel. Also, it was argued that the erection of the coffer-dam was not only a public nuisance, but, as in this case, caused special damage to the plaintiff, for which the right of action was maintainable. The argument was met by the following observations by the court:

"That cannot be a nuisance such as to give a common-law right of action which the law authorizes. * * * A legislature may, and often does, authorize, and even direct, acts to be done which are harmful to individuals, and which, without the authority, would be nuisances; but in such a case, if the statute be such as the legislature has power to pass, the acts are lawful, and are not nuisances, unless the power has been exceeded. In such grants of power a right to compensation for consequential injuries caused by the authorized erection may be given to those who suffer, but then the right is a creature of the statute,—it has no existence without it."

It was there insisted that, though the city had the legal right to construct the tunnel, and to do what was necessary for its construction, subject to the condition that in doing the work there should be no unnec-

essary interference with private property, yet it was liable to make compensation for the consequential damage to persons specially injured. To this proposition the court withheld its assent. The learned justice adds—
"That acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking, within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the state or its agents, or give him any right of action. This is supported by an immense weight of authority."

"The extremest qualification of the doctrine," continues Justice STRONG, "is to be found, perhaps, in *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, and in *Eaton* v. *Railroad Co.*, 51 N. H. 504. In those cases it was held that permanent flooding of private property may be regarded as a taking. In these cases there was a physical invasion of the real estate of the private owners, and a practical ouster of their possession." In the case of *Pumpelly* v. *Green Bay Co.*, *supra*, to which the reference above quoted is made, the plaintiff's demand for damages was based upon the following averments. The defendants had erected a dam across Fox river, the northern outlet of Lake Winnebago, by which the waters of the lake were raised so high as to forcibly, and with violence, overflow the plaintiff's land from the time of the completion of the dam, in 1861, to the commencement of the suit, the water coming in with such violence as to tear up his trees and grass by the roots, and wash them, with his hay by tons away, to choke up his drains and fill up his ditches, to saturate some of his lands with water, and to dirty and injure other parts by bringing and leaving on them deposits of sand, and otherwise greatly injuring them. It is to be observed, also, that the waters of Lake Winnebago were raised so high as to overflow with violence all the lands of the plaintiff from the time of the completion of the dam, in 1861, until the commencement of the suit, in 1867. It was insisted by the defendants that they had erected a dam in accordance with the act of congress, and that the lands in question had not been taken or appropriated. Upon this contention Mr. Justice MILLER, in rendering the decision on appeal, announced: "We are of the opinion that the statutes did not authorize the erection of a dam which would raise the water of the lake above the ordinary level;" thus indicating, as will presently appear, a controlling distinction from the facts before the court here.

With reference to the contention of the defendants, that there was no taking of the plaintiffs' land, within the meaning of the constitutional provision, and that the damage was a consequential result of such use of a navigable stream as the government had a right to make for the improvement of its navigation, Justice MILLER further observes:

"It would be a very curious and unsatisfactory result if, in construing a provision of constitutional law always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators, as placing the just principles of common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that, if the government refrain from the absolute conversion of real

property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction, without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen as those rights stood at the common law, instead of the government, and make it an authority for the invasion of private rights, under the pretext of public good, which had no warrant in the laws or practices of our ancestors."

To this cogent statement, however, the learned justice adds:

"We are not unaware of the numerous cases in the state courts in which the doctrine has been successfully invoked that for a consequential injury to the property of the individual arising from the prosecution of improvements of roads, streets, rivers, and other highways for the public good there is no redress, and we do not deny that the principle is a sound one in its proper application to many injuries to property so originating. And when, in the exercise of our duties here, we shall be called upon to construe other state constitutions, we shall not be unmindful of the weight due to the decisions of the courts of those states. But we are of the opinion that the decisions referred to have gone to the utmost limit of sound judicial construction in favor of this principle, and in some cases beyond it, and that it remains true that, where real estate is actually invaded by superinduced additions of water, earth, sand, and other materials, or by having any artificial structure placed on it so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the constitution, and that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principles. Beyond this we do not go, and this case calls us to go no further."

It seems evident, therefore, that an "actual" invasion of property is essential for the full application of the doctrine thus announced. The case just quoted, declared, as we have seen, in *Transportation Co.* v. *Chicago*, *supra*, to be a somewhat extreme statement against the public, of what constitutes a taking of property for the public use, is readily distinguishable from that before the court. In the one case the construction of the dam so as to raise the waters of the lake was not authorized. In the other, the Cross-tides dam, as it stands, about which the complaint is made, is part of an authorized system of river and harbor improvements, and this has been expressly so decided by the supreme court itself in the case of *South Carolina* v. *Georgia*, 93 U. S. 4; a case having in question the legality of this identical structure. It will be further observed that in *Pumpelly* v. *Green Bay Co.*, there was a continuous and virtually permanent submersion of the land by the waters of the lake, and its practical destruction for all the valuable purposes for which it might otherwise have been utilized. In the case at bar it is simply complained that the drainage of the rice land is impaired by raising the low-water level of the Savannah river two or three feet, thus making the bottoms of the plaintiffs' ditches and canals and sills and flood-gates from one to two feet below the low-water level, and by increasing the liability of said rice lands to overflow; the frequently occurring freshets in the Savannah river rendering it necessary for the plaintiffs to raise banks surrounding the rice fields.

Aside from the doubt which exists as to the right of the plaintiffs, as against the public, to divert the waters of this navigable stream to the injury of navigation, or to use them for any other purpose save that of navigation, to be presently considered, it is evident that the injury complained of is by no means so direct and absolute as in the case of *Pumpelly* v. *Green Bay Co.*, *supra*. It is moreover true that whatever may be the franchise of the plaintiffs in the lands submerged by the flow of the tide, this franchise was subordinate to the power of congress to provide for the necessities of navigation, by means of which the interstate and foreign commerce of the country is carried on. Wood, Nuis. § 615. The paramount authority of congress to control the entire subject of the improvement of navigation upon the waters of the United States is affirmed by the supreme court of the United States, not only in the case of *South Carolina* v. *Georgia*, *supra*, but also in the case of *Bridge Co.* v. *U. S.*, in 105 U. S. 470, and in a multitude of other cases. There can be no doubt of the general doctrine on this subject. It is within the power of the legislature to change or obstruct the course of public waters as the public convenience may require it. Those upon whom authority is conferred for this purpose are not liable for the consequential injuries resulting from their acts, but could not trespass upon or cut a channel through private lands without making compensation for the land so taken. Gould, Waters, §§ 248, 249; Ang. Tide-Waters, p. 92 *et seq.*

It has been long settled that the right of the riparian proprietor is to be considered as a valuable property right, although, in the language of Mr. Justice MILLER in *Yates* v. *Milwaukee*, 10 Wall. 504, "it must be enjoyed in due subjection to the rights of the public." Rights of this character are, such as access to the navigable part of the river from the front of his lot, the right to make a landing, wharf, or pier for his own use, or for the use of the public, subject to such general use or regulation as the legislature may see proper to impose for the protection of the rights of the public, whatever those rights may be. In the case of *Miller* v. *Mendenhall*, decided by the supreme court of Minnesota April 3, 1890, and reported in 44 N. W. Rep. 1141, it is held that the riparian proprietor is entitled to fill in and make improvements in shallow water in front of his land to the line of navigability, and this right, though subject to state regulations, can only be interfered with by the state for public purposes. See, also, *Society* v. *Halstead*, 58 Conn. 144, 19 Atl. Rep. 658; *Boston* v. *Lecraw*, 17 How. 426; *Gregory* v. *Forbes*, 96 N. C. 77, 1 S. E. Rep. 541; *People* v. *Railroad Co.*, 117 N. Y. 150, 22 N. E. Rep. 1026; *Steers* v. *City of Brooklyn*, 101 N. Y. 51, 4 N. E. Rep. 7; *Railroad Co.* v. *Schurmeir*, 7 Wall. 272; *Parker* v. *Packing Co.*, (Or.) 21 Pac. Rep. 822; *Tuck* v. *Olds*, 29 Fed. Rep. 738. There cannot be any doubt, however, that all of these rights are subject to the paramount right of the public to use the river for navigation; nevertheless, if the structures described in many of the cases above cited are absolutely destroyed or injured for the benefit of the public, the riparian proprietor is entitled to compensation. It being true, however, in this case, that whatever rights the plaintiffs may

possess are subordinate to the paramount public right to improve the navigation of the river, and that the structure of the defendant is not on the land of the plaintiffs, it follows that the plaintiffs' demand must depend upon the alteration in the flow between high and low water mark of the navigable stream itself. A franchise so depending has been held to be not private property, but an incorporeal hereditament. *Parker* v. *Packing Co.*, (Or.) 21 Pac. Rep. 822. But whether the franchise or usufruct of the plaintiffs in the flow of the stream between high and low water mark, for injury to which the suit is brought, be strictly an incorporeal hereditament or otherwise, it would appear difficult, upon reason or authority, to justify the action they have brought. It would seem to be otherwise if the stream were not navigable, but upon navigable waters, any franchise depending upon the use of the stream itself seems to be common to all, and to relate to the purposes of navigation and to facilities therefor. The recent case of *Fulmer* v. *Williams*, decided on the 8th day of October, 1888, by the supreme court of Pennsylvania, and published in 15 Atl. Rep. 726, is an instructive decision upon this topic. In that case the plaintiff owned a factory on the west bank of the Lehigh river, and had constructed a dam to an island about 80 feet from that bank, the effect of which was to raise the water about one foot above its ordinary level, thus supplying the water-power for his mill. The defendant, Fulmer, owned land adjoining, and next above, the land of the plaintiff. The evidence showed that he deliberately and maliciously filled up the channel below low-water mark for the express purpose of depreciating the value of the plaintiff's property, and of destroying his water-power. The Lehigh river is a navigable stream, and the plaintiff had no grant from the state to use the water for any purpose. The defendant denied that the plaintiff had title to the water-power as riparian owner or otherwise. The court below instructed the jury, however, that between low and high water marks the plaintiff was the owner of the soil, and subordinate to the right to navigate the stream by the public. He had a right to use the water, and could recover for the destruction of his water-power so far as it occurred with relation to the water flowing above the low-water mark. Upon this subject the supreme court, WILLIAMS J., delivering the opinion, held that—

"The grant of land bounded upon a stream not navigable extends *usque ad filum medium aquæ;* but a grant of land bounded upon a navigable river extends to ordinary low-water mark only. Between this line and high-water mark the land of the grantee is, by the nature and necessities of the situation, subject to a servitude in favor of the public. * * * The grantee takes subject to the rights of the public in and upon the highway, and, as between him and the public, he may use his lands below the line of high water for such purposes only as do not interfere with the free flow and navigation of the water that flows over it." "What rights," the learned justice continues, "has a riparian owner in the water of a navigable river flowing between high and low water marks? The water of a stream is not the subject of ownership. In the ordinary sense of that word. * * * The right to the use of the water follows the ownership of the bed in which it flows. The commonwealth is therefore the owner of the rivers, and holds them for the use of its citizens. They are public property,—natural highways,—open to all who may have oc-

casion to use them. When the volume of the stream swells in time of high water, its surface remains the surface of the highway, and the riparian owner must do nothing that shall interfere with the use of the highway, or any part of it, by the public up to the line of high water. \* \* \* The owner of the shore, having no ownership in the water, has, as between him and the commonwealth, no greater rights in it than any other citizen. He has no right to erect a dam to turn the water to his mill without a grant from the commonwealth of the right so to do; and, if he erects such a dam without a grant, he is a trespasser, and acquires no title to the water-power resulting therefrom. He stands in the same position as an intruder upon a public road, without right, and liable to removal at any moment. He has an indisputable right as a citizen to the use of the river as a public highway, but as a riparian owner he has no right to obstruct its flow, or to divert its waters, except for domestic purposes, and within certain limits, for purposes of irrigation. If he does erect a dam, and turn the water to his mill, he ordinarily infringes the public right only. \* \* \* Applying these principles to the case now before us, it is clear that the plaintiff was allowed to recover for what did not belong to him. He had no title to the water, whether above or below low-water mark, and he could have no legal right to the power resulting from the erection of his dam. Its destruction was therefore *damnum absque injuria.*"

This use seems altogether applicable to the use of the waters of the Savannah river by the plaintiffs for the purpose of flooding their rice fields. The Savannah has been repeatedly held to be a navigable river. See the recent case of *Lawton* v. *Comer*, 40 Fed. Rep. 480, (affirmed by the supreme court of the United States, decision rendered May 25, 1891,) 11 Sup. Ct. Rep. 840. If the malicious and deliberate diversion of the water by the defendant in the case of *Fulmer* v. *Williams, supra,* so as to destroy the water-power of the plaintiff's mill, is *damnum absque injuria,* much more is this true of the diversion of the waters of the Savannah from the rice canals and ditches of the plantiffs by the officers of the government, for the improvement of the navigation of the stream, and for the most important uses of the public. In the case of *Henry* v. *City of Newburyport*, decided by the supreme court of Massachusetts, September 5, 1889, 22 N. E. Rep. 75, it was held that the owner of lands not accessible to navigation from the sea has no cause of complaint because of being deprived, by the erection of walls, or by the filling up of flats, of the ebb and flow of the tide to his premises, or the right thereof to drain from the lands of others; and, further, that such an owner can only maintain an action for damages by reason of nuisance when some right of his own has been invaded. In the case of *Fitchburg R. Co.* v. *Boston & M. R. Co.*, 3 Cush. 88, it was held, Chief Justice SHAW rendering the opinion, that if the piers of a bridge which is authorized by the legislature, change tidal currents, a littoral proprietor is not entitled to recover the expense of a structure necessary to protect his land. It is incident to the power of the legislature to regulate a navigable stream so as best to promote the public convenience. These cases are valuable, because in Massachusetts, as in Georgia, the low-water line is the boundary of littoral proprietors on the tide-waters. In the case of *Davidson* v. *Railroad Co.*, 3 Cush. 105, certain riparian proprietors were using for their mills, and for navigation

in connection therewith, certain flats from which the tide wholly ebbs, lying between upland territory and navigable water. The plaintiff had erected a mill, the motive power of which was the ebb and flow of the tide. The defendant, a railroad company, which the legislature had required by the provisions of its charter to pay for private property taken by it, built a solid embankment across the flats, thereby entirely cutting off the flow of the tide, and thus destroying the value of the plaintiff's mill. It was held by the court, upon suit brought to recover the value of the water-right taken, that the plaintiff had no right, as against the public, to have these flats kept open.

The plaintiffs here rely upon the act of the general assembly of Georgia of 1790, (Code, § 2232.) It is as follows:

"All persons owning, or who may hereafter own, lands on any water-courses in this state, are authorized and empowered to ditch and embank their lands, so as to protect the same from freshets and overflows in said water-courses: provided, always, that the said ditching and embanking does not divert said water-course from its ordinary channel; but nothing shall be so construed as to prevent the owners of land from diverting unnavigable water-courses through their own lands."

Aside from the fact that this would seem to deny to the plaintiffs the right to divert the water of a navigable stream through their lands, the act was passed after the adoption, by the state of Georgia, of the constitution of the United States, and is, of course, subordinate to the provision in the latter instrument relating to the control of commerce, and, as a consequence, of the navigable waters, by congress. And there are many authorities to the effect that this control is paramount even where the state has undertaken to make enactments upon the subject of navigation itself. Gould, Waters, § 149, citing *Lyon* v. *Fishmonger Co.*, L. R. 1 App. Cas. 662; *Ewing* v. *Colquhoun*, L. R. 2 App. Cas. 839; *South Carolina* v. *Georgia*, 93 U. S. 4; *Pensacola Tel. Co.* v. *W. U. Tel. Co.*, 96 U. S. 1; *Cardwell* v. *Bridge Co.*, 113 U. S. 205, 5 Sup. Ct. Rep. 423; *Bridge Co.* v. *U. S.*, 105 U. S. 470; *Mobile Co.* v. *Kimball*, 102 U. S. 691; *Com.* v. *City of Roxbury*, 9 Gray, 491; Gould, Waters, § 27.

Very great importance is attached by the plaintiffs to the decision of the supreme court of the United States in the case of *U. S.* v. *Manufacturing Co.*, 112 U. S. 647, 5 Sup. Ct. Rep. 306. There, however, was an actual appropriation of the plaintiffs' lands, and the water-power they were bought to control. There was an actual conversion of private property to public use. Besides, the appropriation was not for the purpose of the improvement of a navigable stream; and the property of the plaintiffs in that case, unlike that involved in the question before this court, was in no way subservient to the government for the public use for which it was taken. It was a distinct exercise of the right of eminent domain, and not, as in the case here, the proper exercise of the legitimate and ordinary functions of the government, from which a consequential damage to the plaintiffs may have resulted. Moreover, congress had distinctly recognized the right of the Great Falls Manufacturing Company

to compensation, and had submitted the liability of the United States for the conversion of the property, to arbitration, the results of which, merely, were affirmed by the supreme court of the United States.

Upon a careful consideration of all that has been advanced by the plaintiffs in support of their claim, we are of the opinion that all the right they have in the ebb and flow of the tide of the Savannah river is subordinate to the control of the government over that navigable stream, for its free navigation by the public.

We are further of the opinion that the free navigation of that stream comprehends, necessarily, all of those improvements which the government is at liberty to make to facilitate and enlarge the interstate and foreign commerce carried upon its waters, and, the sovereign authority of the nation having determined that the waters of the river shall be confined, for the purpose of scouring and deepening the channel, the plaintiffs have no legal claim against the government for the diversion of those waters from their rice fields, or for an increase in the flow of the tide which will fill the canals and ditches they have constructed on the level between low and high water mark; a level which is subservient to the government for the purposes of navigation.

It must be observed, with relation to the claim of damage caused by the overflow of the plaintiffs' lands during the freshets, that they do not stand in the attitude of land-owners above mean or high water level. Their lands are reclamations as appears from the declaration, which would be covered, not only by ordinary high water, but by the ordinary flow of the tide. The government, as we have seen, has found it necessary to change this flow for the purposes of navigation, and the reclamations of the plaintiffs are subservient to that necessity. *Com.* v. *City of Roxbury*, 9 Gray, 491–495; *U. S.* v. *Pacheco*, 2 Wall. 587; *Martin* v. *Waddell*, 16 Pet. 411; *Barney* v. *Keokuk*, 94 U. S. 324; Gould, Waters, § 27.

If it had been possible, however, to have reached a different conclusion as to the rights of the plaintiffs, we are clearly of the opinion that the court has no jurisdiction to hear and determine the plaintiffs' demand, because it makes a case sounding in tort, and therefore is especially excepted from the operation of the statute extending the jurisdiction of the court of claims to the circuit and district courts of the United States. If it were an action pending between individuals, it would be necessarily *ex delicto*. It is a nuisance to stop or divert waters that used to run to another's meadow or mill. 3 Bl. Comm. 218. Running out a dam into the water-way of a navigable river, giving new direction to the current, causing his neighbor's land to be washed away, is a tort. 1 Add. Torts, § 4. The overflow of lands by a mill-pond is a tort. 4 Amer. & Eng. Enc. Law, p. 978; citing *Wilson* v. *Myers*, 4 Hawks, 73. See, also, 1 Chit. Pl. pp. 140–142. Tort includes wrong suffered in consequence of the negligence or malfeasance of others, where the remedy at common law is by an action on the case. *Leathers* v. *Blessing*, 105 U. S. 626–630.

Plaintiffs insist that the dam erected to improve the navigation of the river has raised the level of mean low tide, and the latter result has destroyed their usufruct in the waters of the river for the purposes of rice culture on their lands on Hutchinson's island and on the main-land. They are not suing for the conversion of the land, nor is it alleged that the government has converted to its own use the water-rights connected with the lands, but they are suing for consequential injuries to their water-rights, resulting indirectly from the act of the government, which act was performed for a lawful purpose, and not performed on the land with which the usufruct was connected. It is true that if the property be tortiously taken or converted, the tort-feasor may be sued in trespass or trover, or the injured party may waive the tort, and sue in *assumpsit*, upon the implied contract to compensate. In the latter case the same result follows as if there had been an implied contract, as insisted by the plaintiffs here. *May* v. *Le Claire*, 11 Wall. 217. This, however, is applicable where there has been an actual conversion of the property, and not an indirect injury to it, resulting from acts which the alleged tort-feasor had the legal right to perform. Any demand of the plaintiffs, therefore, must be based upon the tortious conduct of the defendant's agents; but to constitute a tort two things must concur,—actual or legal damage to the plaintiff, and a wrongful act committed by the defendant. The court being of the opinion that neither of these essentials exists in the case at bar, we feel constrained, on both the questions herein considered, to sustain the demurrer to the plaintiffs' declaration, and to order the case dismissed.