CAMP FAR WEST IRR. DIST. v. UNITED STATES.

No. 46230.

Court of Claims.

Dec. 2, 1946.

Marion B. Plant, of San Francisco, Cal. (Brobeck, Phleger & Harrison, of San Francisco, Cal., and J. Raymond Hoover, of Washington, D. C., on the brief), for plaintiff.

Henry Weihofen, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, and MADDEN, Judges.

JONES, Judge.

This is a claim for just compensation based upon the alleged taking of what plaintiff claims was a valuable prescriptive right to construct a diversion dam each year for irrigating lands owned by its members.

Plaintiff is an irrigation district organized under the laws of the State of California. The district includes 4,090 acres of land, about 2,045 acres of which are irrigable. For years the district has been supplied by plaintiff with water from the Bear River.

Various perennial as well as annual crops were grown on these lands. None of these could be grown without water which plaintiff supplied from the Bear River, no other water being available.

The evidence shows that with such irrigation the value of the land in the district is approximately $1,200,000 and without such water the value would be about $300,000.

Plaintiff owns and operates a concrete storage dam and a seasonal reservoir of 5,000 acre feet capacity. The dam is located about two miles upstream east of the eastern boundary line of the district. Here water is stored during the winter and spring months. During the summer and fall it is released downstream to points where it is diverted to the land in the irrigation district.

In 1932 and each year thereafter plaintiff constructed a diversion dam about three or four feet high across Bear River at a narrow place about one mile below the res-

ervoir dam, by scraping up gravel on either side and placing it across the river. This dam would raise the level of the water to the point where it would flow into the canals on each side of the river. Each fall, after the irrigation season, the plaintiff would cut the temporary dam and allow the winter floods to wash it away. Each year the same process was repeated.

Plaintiff did not own any lands at this point on either side of the river. The title of the owners ran to the middle of the stream, and none of them has ever formally granted any easement or other interest to the plaintiff authorizing it to build such diversion dam. The nearest boundary line of the district was about 1,600 feet downstream.

At the time the reservoir dam was built the property on the south side was owned by the Lincoln Packing Company. In purchasing the site for the dam and reservoir from that company plaintiff also acquired an easement to construct an aqueduct from that point to the boundary of the district, but it was never built.

The E. Clements Horst Company owned the land on the north side of the river. It later sold this land to R. C. and A. N. Catlett, retaining an easement to maintain such levees, ditches, dams, weirs and dykes as were necessary for the use of certain water rights which it reserved.

On February 29, 1944, the United States Government purchased from the Catletts the land on the north side of the river at and for a considerable distance above and below the reservoir dam.

When the plaintiff constructed and used the gravel diversion dam in 1932 and subsequent years it did so under a claim of right based upon the assumption that it was entitled to do so. Plaintiff's action was open and notorious. It claims that by the annual construction and use of the diversion dam from 1932 to 1943 it acquired a prescriptive right or easement for such purposes under the laws of the state of California. The defendant was given no actual notice of the asserted easement, but representatives of the defendant who removed the gravel from the bar alongside the stream knew of the existence and lo-cation of plaintiff's diversion dam. The same is true of Government contractors who removed gravel from the same area.

The kernel of plaintiff's claim is that by removing gravel from below the diversion dam prior to June 1, 1943, defendant had caused the stream bed to be lowered to such an extent that the plaintiff could no longer divert water by means of the small gravel dam, and that this action amounted to a taking by defendant of plaintiff's right or easement as of June 1, 1943.

On the north side of the river was a large gravel bar extending downstream from the diversion dam a distance of more than 1,600 feet. The only access to this bar was a road built by one of the Government's contractors in 1942. From time to time dirt haul roads were built in loops out over the gravel bar and connected with the access road.

Between September 22, 1942, and January 12, 1943, Government contractors removed some 80,000 tons of gravel from land owned by the Lincoln Packing Company. All this gravel was taken from a point more then 1,600 feet below the diversion dam.

In 1942 Hanrahan, one of the Government contractors, removed gravel from the property then owned by the Catletts, operating in an area between the access road and a point about 1,000 feet below the diversion dam.

In October and November 1942 representatives of the Army from Camp Beale hauled an estimated 20,000 tons of gravel from the same area. The access and haul roads built by the contractors were used by the defendant in removing this gravel.

In 1943 Hanrahan built new haul roads upstream to within 400 or 500 feet of the dam and both he and Army units hauled gravel from this area, the exact amount of which is not shown. In the spring of 1943 one of the haul roads was built to within 100 or 150 feet of the dam, but the great bulk of the gravel taken by the Army was from an area more than 400 feet below.

Except for the amount taken from the land of the Lincoln Packing Company no record was kept as to amounts removed either by the Army or the contractors. The

Army secured gravel from other sources, including the Yuba River.

In April 1943 the bed of the Bear River had been so lowered that water could not be diverted into the canals from a dam three feet high. Plaintiff informed the Army officers and requested the Army, which had heavy equipment, to assist in constructing a higher dam. The Army made equipment and engineers available to build a dam seven feet high. They frequently did construction work as a part of their training.

The heavy flow of water washed this dam out. The Army rebuilt the dam with a larger spillway. The Army did this as a favor to plaintiff and without any admission of liability. But the added height of the gravel dam increased the water pressure, resulting in extensive seepage through and under the dam, so that the water was used up before the end of the irrigation season.

Between October 1943 and January 1944 plaintiff built a new concrete dam at the same site, at a cost of $51,156.81.

Plaintiff sues for the cost of this dam, plus an allowance for maintenance, a total of $65,445.41, which it alleges is the fair and reasonable value of the right, privilege and easement which it alleges was taken from it by the action of the defendant.

Defendant denies liability asserting

"1. That plaintiff has not proved a prescriptive right or easement.

"2. That if so, that right or easement has not been taken by defendant.

"3. That there was no contract, express or implied, to pay compensation.

"4. That if there was a taking plaintiff cannot recover the cost of the dam."

The facts are sufficient to support an ultimate conclusion that

I. Plaintiff had acquired a prescriptive right to construct and maintain a diversion dam, suitable for the purposes of its prescriptive use, across the Bear River at the time defendant first removed gravel from the river bed downstream.

■ Prescription, as applied to incorporeal things, had its origin in the doctrine of a lost grant. In this country, however, the courts have generally followed the analogy of the statute of limitations applicable to actions for recovery of land, "with the effect that one who has exercised as of right a user in another's land for the statutory period, is regarded as having a right of user to that extent, the length of the period of prescription changing as the statutory period is changed. And while, quite frequently, it is said that from such user a grant will be presumed, the presumption is in effect a positive rule of law, and evidence that no grant was made would be immaterial." Tiffany, The Law of Real Property, 3rd Ed., Sec. 1191; see Smith v. Hawkins, 110 Cal. 122, 42 P. 453.

■ In California Section 1007 of the Civil Code fixes the time in which a right by prescription shall be acquired as "Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar an action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all." Section 325 of the Code of Civil Procedure, requiring an adverse possession for a period of five years in order to acquire title to real estate, has been construed by the courts of California as being applicable to rights by prescription as well.

■ The elements required to make out an adverse possession are stated in Thomas v. England, 71 Cal. 456, 12 P. 491, 492, as follows:

"(1) The possession must be by actual occupation, open and notorious, not clandestine. (2) It must be hostile to the plaintiff's title. (3) It must be held under a claim of title, exclusive of any other right, as one's own. (4) It must be continuous and uninterrupted for a period of five years prior to the commencement of the action. (5) Since the passage of the proviso to section 325 of the Code of Civil Procedure, in 1878, payment of taxes."

■ The foregoing facts satisfy the requirements of an adverse user, as set forth in Thomas v. England, supra, under the rule announced in Fleming v. Howard, 150 Cal. 28, 87 P. 908, Wallace v. Whitmore, 47 Cal.App.2d 369, 117 P.2d 926, and numerous other California cases cited in the latter opinion. The cases hold that

clear and satisfactory evidence that a right of way was used for more than five years openly, notoriously, visibly, continuously, and without protest, opposition or denial of right to do so creates a prima facie title to the easement by prescription.

Contrary to certain language found in Heenan v. Bevans, 51 Cal.App. 277, 196 P. 802, cited in defendant's brief, the above authorities show the burden of proof that the use was merely permissive to be upon the landowner. Tiffany, Real Property, 3d Ed., sec. 1196a, states the rule to be as follows (citing Fleming v. Howard, supra):

"Since it is the recognition of a right in the landowner to put an end to the user which deprives the user of the element of adverseness, and such recognition is in its nature an affirmative fact, the burden of proof in reference thereto is properly on the landowner, that is, in the absence of evidence to the contrary, the user of another's land is ordinarily presumed to be adverse."

Likewise seeemingly contrary to certain language found in American Co. v. Bradford, 27 Cal. 360, and certain other cases cited in defendant's brief (R. 67) to the effect that the adverse user must be known to the owner of the land in order that the doctrine of prescription may apply against him, it appears that actual knowledge on his part need not be shown, it being sufficient that the user is so visible and notorious that, in the exercise of due diligence, he would learn thereof. Abbott v. Pond, 142 Cal. 393, 76 P. 60; Bernstein v. Dodik, 129 Cal.App. 454, 18 P.2d 983.

In Bernstein v. Dodik, supra, plaintiffs sought to quiet title to an alleged easement consisting of a driveway running between plaintiffs' lot and that of defendant, being partly on one and partly on the other, and constituting the only access to certain garages at the rear of the driveway. Plaintiffs and their predecessors in title had used the driveway for ingress and egress for over ten years. Defendant claimed that the use was permissive, not continuous, and not adverse. Held, on appeal from the trial court's finding that plaintiffs had acquired ownership of the easement, (1) that the question as to whether or not the use of the driveway was under a claim of right or as a mere matter of neighborly accommodation was a question of fact to be determined by the trial court in light of the relation of the parties, their conduct, the situation of the property, and all the surrounding circumstances; (2) that while it is a well-established principle that the use must be adverse, yet it is an equally well-established principle that where the use of the easement is continuous or openly and notoriously adverse to the owner it creates the presumptive knowledge in him that the person using the easement is doing so under a claim of right.

In this there is no conflict with the cases cited by the defendant as holding that a use by mere consent, permission, or indulgence of the owner of the servient tenement may be implied from the facts and circumstances under which the use was enjoyed.

There is no merit to the defendant's suggestion that plaintiff has failed to show the payment of taxes on the dam site. The payment of taxes required by the California Code of Civil Procedure (sec. 325) as a condition to acquiring title by adverse possession applies only to the payment of taxes levied and assessed. It does not apply to a mere easement which is not separately assessed for the purpose of taxation. Humphreys v. Blasingame, 104 Cal. 40, 37 P. 804; Smith v. Smith, 21 Cal.App. 378, 131 P. 890.

As an irrigation district, plaintiff's properties were not assessed.

If taxes were assessed separately against the easement the burden was upon defendant to show it. Redemeyer v. Carroll, 21 Cal.App.2d 217, 68 P.2d 739.

The periodic absence of use of the claimed easement by plaintiff during the winter months did not affect its acquisition of a prescriptive easement. An omission to use when not needed does not disprove a continuity of use, shown by using it when needed. Hesperia Land & Water Co. v. Rogers, 83 Cal. 10, 23 P. 196, 17 Am.St. Rep. 209.

But at this point plaintiff has found difficulty in meeting the other objections raised by defendant, and the basis of its asserted right to recover against the defendant begins to grow thin.

II. There was no taking within the meaning of the Fifth Amendment of the prescriptive easement thus acquired by plaintiff.

In Gray v. McWilliams, 98 Cal. 157, 32 P. 976, 21 L.R.A. 593, 35 Am.St.Rep. 163, it is pointed out that there are two kinds of easements, similar to one another in many respects, but differing in many particulars. To the first class belong those easements created by act of man, and to the second those which are given by the law to every owner of land. The latter class is given by law, because without them there would be no security in the enjoyment of land by its owner. Without them a neighbor might deprive a landowner of the benefits derivable from things which in the course of nature have been provided for the common good of all, and which the law wisely provides shall not be wrested from one by the act of another. These easements are said to be inherent in the land "ex jure naturæ" and are often termed "natural rights." In its opinion in Gray v. McWilliams the court comments that confusion often arises through a failure to distinguish between the two types of rights, and that principles applicable to one may be inapplicable to the other.

■ Tiffany, Law of Property (3d ed.) secs. 714–715 and 757, goes so far as to say that these natural rights, the rights of a landowner to demand that his neighbors shall refrain from interference with the enjoyment or possible enjoyment of the former's land, may be referred to as an easement, only "with doubtful propriety." The author therefore adopts the expression "natural rights" as distinguished from the term "easements" to describe the different phases of the general right in a landowner freely to enjoy the use of his land in its natural condition, without interference by his neighbors.

It is important to observe, in connection with the analysis which will follow as to the rights acquired by plaintiff through prescription, that Tiffany has not been concerned, in his discussion of a landowner's natural rights, with those other classes of rights which a landowner enjoys as regards his own land, such as the right to freedom from interference with his possession, the right to demand that the owners of neighboring land shall exercise due care not to cause physical damage to his land or the improvements thereon, and the right available in some circumstances to demand that, irrespective of any question of due care, an owner of neighboring land shall not cause physical damage of a more or less permanent character to his land or structures thereon, as the result of a condition intentionally created on such neighboring owner's land (sec. 714). These rights are rights, however, to immunity from a physical invasion of the owner's domain in one fashion or another. Four conclusions logically follow:

1. The removal of gravel by defendant cannot be construed as a taking of plaintiff's natural rights.

Even if plaintiff had been the owner in fee of the land upon which the diversion dam was erected, the removal of gravel from the stream bed some hundreds of feet downstream would not violate any natural right of plaintiff in the dam site recognized by law. The closest approach to such a right would be, perhaps, the natural right of a landowner to lateral support of his own land. But even here the right of lateral support would apply only to the soil in its natural state. As stated in Sullivan v. Zeiner, 98 Cal. 346, 33 P. 209, 20 L.R.A. 730, one does not acquire a right to lateral support of structures superimposed thereon by the simple expedient of maintaining them thereon for the prescriptive period.

But plaintiff was not the owner of the land upon which the diversion dam was erected. Hence, even if it be conceived that there is some natural right in the owner of an upper portion of a stream bed that the downstream owner shall not so use his portion of the stream as to increase the normal erosion and lowering of the upper stream bed, plaintiff could found no action upon such natural right. The evidence as to plaintiff's prescriptive user of the land

of Lincoln Packing Company and of the Catletts which comprise the dam site would not warrant a finding that plaintiff had by this same user succeeded to such supposed natural right of said parties in the land made servient to the diversion dam easement, as a basis for claiming this natural right had been taken.

2. Plaintiff's action must rest, then, upon some taking, in the constitutional sense, of the easement acquired by plaintiff to erect and maintain a dam upon the land owned by the Lincoln Packing Company and the Catletts, or that plaintiff's prescriptive easement included some right restrictive of the servient owner's right to remove gravel from its land downstream, the interference with which by defendant constituted a taking of plaintiff's property.

As pointed out in Tiffany, Law of Property, 3d Ed., sec. 756, easements (as distinguished from natural rights) may be of two kinds, affirmative easements which authorize the doing of acts which, if no easement existed, would give rise to a right of action, or in other words involve the creation of a privilege; and negative easements which do not authorize the doing of an act by the person entitled to the easement but merely preclude the owner of the land subject to the easement from doing the act which, if no easement existed, he would be entitled to do. As examples of affirmative easements the author mentions a right of way, a right to discharge water on another's land, and a right to maintain a structure thereon, while a right to have light pass to one's building over another's land, and a right to have one's building supported by such land are cited as examples of negative easements, it being pointed out that the latter type are of much less frequent occurrence.

Under Point I it was concluded that plaintiff through its prescriptive use acquired both as against the land owned by the Lincoln Packing Company and the land owned by the Catletts, at the dam site, the affirmative right to erect and maintain a diversion dam of the character and extent indicated by its prescriptive use. We defer, for the moment, consideration as to whether plaintiff also acquired some negative easement.

In an affirmative easement the owner of the servient tenement may make any use of his land which is consistent with or not calculated to interfere with the exercise of the easement. He may not, of course, so alter the servient tenement as to destroy the easement, nor make such changes or do such acts as would obstruct the exercise of the easement and render the easement ineffective. Tiffany, sec. 811.

In view of the circumstances under which the gravel was removed by defendant and others, and in the absence of any proof of protest from plaintiff while this was going on, a conclusion that defendant's act was inconsistent with or calculated to interfere with the exercise of plaintiff's right to maintain a diversion dam some hundreds of feet upstream would scarcely be warranted. Particularly is this true in view of the state of the record as to just how much defendant's removal of gravel may have contributed to the ultimate lowering of the stream bed at the site of the dam. If defendant's removal of gravel was a disturbance of plaintiff's easement, then so must have been the removal of gravel by the several private contractors, and so would have been the taking of gravel by the Catletts if they had decided to scrape up some of the gravel for their own use.

When we come to a legal consideration of plaintiff's rights against the United States for the consequent damage to its dam resulting from the removal of a portion of the gravel downstream, a principle other than that obtaining between private parties comes into play. As stated in Bedford v. United States, 192 U.S. 217, at page 224, 24 S.Ct. 238, 240, 48 L.Ed. 414:

"The Constitution provides that private property shall not be taken without just compensation, but a distinction has been made between damage and taking, and that distinction must be observed in applying the constitutional provision. An excellent illustration is found in Gibson v. United States, 166 U.S. 269, 41 L.Ed. 996, 17 S.Ct. 578. The distinction is there instructively explained, and other cases need not be cited."

The manner in which the distinction has been applied in the courts is well illustrated by the case of Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336. There the plaintiff sought to recover damages sustained by reason of the construction by the city of a tunnel under the Chicago River along the line of La Salle, and adjacent to plaintiff's wharf. No physical property of plaintiff was taken but there was evidence of an interference with the use by plaintiff of its property, whereby it was compelled to rent and remove to other docks and sheds. In denying plaintiff relief the court, 99 U.S. at page 641, 25 L.Ed. 336, noted that it was the prerogative of the State to be exempt from coercion by suit, except by its own consent, and went on to state:

"The remedy, therefore, for a consequential injury resulting from the State's action through its agents, if there be any, must be that, and that only, which the legislature shall give * * * But acts done in the proper exercise of governmental powers, *and not directly encroaching upon private property,* though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action. This is supported by an immense weight of authority * * * The extremest qualification of the doctrine is to be found, perhaps, in Pumpelly v. Green Bay Company, 13 Wall. 166, 20 L.Ed. 557, and in Eaton v. Boston, Concord & Montreal Railroad Co., 51 N.H. 504, 12 Am.Rep. 147. In those cases it was held that permanent flooding of the private property may be regarded as a 'taking.' In those cases there was a *physical invasion* of the real estate of the private owner, and a practical ouster of his possession. But in the present case there was no such invasion. No entry was made upon the plaintiff's lot. All that was done was to render for a time its use more inconvenient." [Italics supplied.]

To the two cases referred to above, as extreme qualifications of the doctrine discussed, there must be added, today, such cases as United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, and United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746, where there has been some ouster of plaintiff's possession amounting to an appropriation; and Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287, and Causby v. United States, 60 F.Supp. 751, 104 Ct.Cl. 342; Id., 328 U.S. 256, 66 S.Ct. 1062, 1063, where "Servitude has been imposed" upon the land which constitutes at least a partial appropriation of it, or as Mr. Justice Douglas put it "A direct invasion of respondents' domain."

■ 3. Defendant's removal of gravel from the lower stream bed did not constitute a taking of plaintiff's affirmative easement.

It is conclusive from the facts we have found that the thing done by the defendant, namely, the removal of gravel, involved no direct encroachment on plaintiff's diversion dam, quite aside from the question whether the ultimate consequence of its act may have impaired its use as it then existed. There was no physical invasion of plaintiff's corporeal property as represented by the diversion dam, nor such alteration of the servient tenement as to render ineffective or to destroy the privilege plaintiff had acquired therein to accumulate the waters at the point of the dam site at sufficient level to divert them into its diversion canals. Consequently, the instant claim cannot be maintained upon the authority of either United States v. Lynah, supra, or United States v. Cress, supra.

In the Lynah case, the defendant's dam caused water to overflow private property so as to totally destroy its value. There was thus a direct physical invasion and appropriation.

In the Cress case the defendant's lock and dam so raised the water in the stream below plaintiff's mill dam as to destroy the power of the mill dam essential to the value of the mill. Mr. Justice Pitney described the right to have the water flow away from the mill dam unobstructed, except as in the course of nature, as existing by the law of nature as "An inseparable part of the land", the destruction of which is a tak-

ing of a part of the land (243 U.S. at page 330, 37 S.Ct. at page 386, 61 L.Ed. 746).[1]

United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787, 28 L.R.A.,N.S., 385, 19 Ann.Cas. 680, cited by plaintiff (R. 57) is to the same effect as the Lynah case.

The Portsmouth and the Causby cases, supra (and possibly the inference to be drawn from some of the language in United States v. Commodore Park, Inc., 324 U. S. 386, 65 S.Ct. 803, 89 L.Ed. 1017), do represent an extension of the principle involved in the preceding cases, but it is an extension of degree. The conception of what constitutes an invasion and appropriation of the private owner's domain is broadened, but the necessity of a taking is adhered to, and the appropriation or taking upon which the right to compensation is made dependent is an intentional appropriation of the private party's property, even though the property conceived to be taken is of an incorporeal nature. It is conceivable that had defendant, in the instant case, in the proper exercise of governmental power, prevented plaintiff from either a continued use of the diversion dam or further diversion of the waters accumulated by it, a basis would exist for allowing compensation for a taking within the constitutional provision. If defendant had opened a channel immediately above plaintiff's dam so as to draw off the head of water which the dam was intended to cause to flow into plaintiff's diversion canals, we would have a case within the scope of the Welch case where compensation was allowed based upon the intentional taking by flooding of the plaintiff's private right of way across another's land.

In the present case there was neither an appropriation nor an intention to appropriate plaintiff's dam or the easement under which plaintiff was privileged to use it. Consequently there was no taking within the meaning of the constitutional provision. In Vansant v. United States, 75 Ct. Cl. 562, 566, 567, this court said:

"In order to come within the constitutional provision there must be shown to have been an exercise, by the United States, of a proprietary right for a greater or less time, in the property taken. A taking within the meaning of the amendment must have been an intentional appropriation of the property to the public use, and the appropriation must have been authorized by law. * * *

"On the other hand, it has been repeatedly held, and the correctness of the rule is not open to question, that where land is merely damaged by the impairment of its use or value as an incidental consequence of the lawful exercise of power by the Government there is no taking."

There is much similarity between the facts of the present case and those of Horstmann v. United States, 48 Ct.Cl. 423, affirmed 257 U.S. 138, 42 S.Ct. 58, 66 L. Ed. 171. Remembering the questionable causal connection between defendant's removal of gravel and plaintiff's necessity to rebuild its dam in the instant case, Mr. Justice McKenna's discussion of the matter of the Government's intention is particularly apropos. In the Horstmann case, supra, the construction and operation of a Government irrigation project by which water was brought into the watershed apparently resulted in water percolating through the ground so as to cause an unforeseen flooding of the claimant's soda lakes. It was claimed this constituted a taking and appropriation by the United States. The Government took issue with claimant as to the causal connection between its works and the injury to claimant's properties. Mr. Justice McKenna, noting that the "[Lower court's] decision was the Scotch verdict of 'not proved'" went on to state (257 U.S. at pages 145, 146, 42 S.Ct. at page 59, 66 L. Ed. 171):

"However, we need not arbitrate the contentions, but will assume with appellants that there was causal connection between the work of the Government and the rise of waters in the lakes and the consequent destruction of the properties of appellants, but it does not follow that the

---

[1] Cf. United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101.

government is under obligation to pay therefor, as for the taking of the properties.

\* \* \* \* \* \*

"It is to be remembered that to bind the government there must be implication of a contract to pay, but the circumstances may rebut that implication. In other words, what is done may be in the exercise of a right and the consequences only incidental, incurring no liability. Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; [State of] Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956; Tempel v. United States, supra [248 U.S. 121, 39 S.Ct. 56, 63 L. Ed. 162]."

If we assume that there was a substantial causal connection between the removal of gravel by the Government in the instant case, and the lowering of the stream bed at the site of plaintiff's diversion dam, to such an extent as to require plaintiff to substitute a concrete dam in place of its periodic gravel dams, still it does not follow, as of course, that the Government is under obligation to pay for the concrete dam, as for a taking of plaintiff's privilege to dam the stream each year with gravel from the stream bed. Under the doctrine illustrated by the Horstmann case there must be some implication of a promise to make the compensation required by the Constitution where there is an intentional taking of private property for public use. The necessity of an intention to take, as a limitation upon the generality of expression found in the Lynah case, is clearly pointed out by the Supreme Court in the Horstmann case, and again in its opinion in the Portsmouth Co. case, reiterating the proposition stated in the earlier hearing of the case. Peabody v. United States, 231 U.S. 530, 538, 34 S.Ct. 159, 58 L.Ed. 351. The intention to impose a servitude upon the land was deemed a prerequisite to the implication of a contract to pay.

In the present case "it would border on the extreme" to say that the Government intended a taking by the act of removal of gravel from the stream bed a substantial distance below plaintiff's dam.

■ 4. The prescriptive easement acquired by plaintiff did not include a withdrawal of the right in the servient land owners to use the gravel in the stream bed below the dam, beyond the amount plaintiff might reasonably require to restore its gravel dam each year. In any event the removal of gravel by defendant under the circumstances shown in this case would not constitute a taking.

Since the sole *gravamen* of plaintiff's action appears to be the interference by defendant of some supposed right in plaintiff restricting the right of the servient owners to enjoy the normal use of their property, we may inquire first whether there is a proper foundation for the claim of plaintiff to such a negative easement on the land from which the gravel was removed. This would be preliminary to the further consideration whether the removal of gravel by defendant was a taking of plaintiff's property or whether the effect upon plaintiff's affirmative easement for a dam was not merely a consequential damage.

■ It must be remembered that plaintiff's entire right in the property involved arises solely from its prescriptive use starting in 1932. "In the case of prescriptive easements, the mode and extent of user of the servient tenement permissible are determined, generally speaking, by the mode and extent of the user during the prescriptive period." Tiffany, Law of Real Property, 3d Ed., sec. 808. The mode and extent of plaintiff's user during the prescriptive period, insofar as they might have evidenced to the Catletts and the Lincoln Packing Company some hostile claim, as of right in the plaintiff, to the gravel below the dam site, would have warned them only that plaintiff was asserting a right to scrape up gravel each irrigation season in such quantity in the area adjacent to its dam site as might be necessary to back up the water in the stream to the diversion canals. To so extend the claim of a prescriptive right to erect and maintain a diversion dam as to include therein a collateral right to restrict in the fashion now claimed by plaintiff, the servient owners' use of the lower stream bed, would compel a reexamination of, and cast a serious doubt upon, the conclusion that the nature of plaintiff's use was so openly and notoriously adverse to the owners as to give

rise to a presumption of knowledge on the part of the owner that the person so using his premises was doing so under a claim of right.

The findings will not, therefore, support a conclusion that by plaintiff's prescriptive user the normal privilege of the servient owners to use the gravel in the stream bed below the dam had been restricted to such use as would not in any way contribute to the gradual washing downstream of the gravel from above so as to ultimately lower the stream bed at the site of plaintiff's dam.

Even if such limitation of use could be implied the necessary evidence of any intention on the part of the defendant to appropriate this negative right for a public purpose is entirely absent. Indeed, the facts set out in the findings make it apparent that the representatives of the Government, in doing what they did, had no intention of interfering with plaintiff's enjoyment of its easement, and no intention of doing anything with regard thereto subjecting the Government to liability. Neither plaintiff nor the Government men were aware of the effect that the removal of gravel downstream ultimately would have touching plaintiff's dam. The ultimate effect, unforeseen at the time, was at most not a destruction of plaintiff's easement but simply an injury which could be and was remedied at an expense. The case is one, then, similar to Mills v. United States, D.C., 46 F. 738, 12 L.R.A. 673, where recovery against the United States for expense in raising the levees around the plaintiff's rice fields and providing a new means of drainage, necessitated by Government work on the Savannah River, was refused. In distinguishing the Mills case from the facts before the court in United States v. Lynah, supra, Mr. Justice Brewer observed (188 U.S. at page 474, 23 S.Ct. 858, 47 L.Ed. 539):

"Obviously, there was no taking of the plaintiff's lands, but simply an injury which could be remedied at an expense as alleged of $10,000, and the action was one to recover the amount of this consequential injury. The court rightfully held that it could not be sustained. Here there is no finding, no suggestion, that by any expense the flooding could be averted. * * * But as a practical matter, and for the purposes of this case, we must, under the findings, regard the lands in controversy as irreclaimable and their value wholly and finally destroyed."

It is true that substantial expense to plaintiff may be traced inferentially from defendant's removal of gravel, but as stated in United States v. Cress, supra [243 U.S. 316, 37 S.Ct. 385], "It is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking."

In Southern Pacific Co. v. United States, 58 Ct.Cl. 428, the Government, under authority of Congress, constructed a jetty or breakwater at the mouth of a bay, the effect of the construction causing the waters of the ocean to break with such force against plaintiff's railroad, located on the land bordering the bay, as to wash away and destroy a section thereof. The plaintiff constructed a bulkhead to protect its property at a cost of $55,916.28, and showed that it would be compelled to expend $25,000 additional. It alleged that this amounted to an appropriation of its property by the Government, and that it was entitled to just compensation for damages to its right of way, estimated on the basis of what it has and will cost it to repair such damage. In dismissing the petition the court stated (58 Ct.Cl. at page 432):

"Moreover it does not appear that there has been a taking of property in this case for which just compensation can be awarded. It is true that the loss of property did not occur until the jetty had been built by the Government; that the building of the jetty caused the loss is matter of opinion; but assuming that there was some connection between the work of the Government and the flow of the ocean currents and the consequent loss or damage of plaintiff's property, it does not follow that the Government is under obligation to pay therefor as for the taking of the property. * * * But in this case the facts found preclude the implication of a promise to pay. The property was admittedly not taken for public use; there was no

intention to take it; the damage done, if any, was consequential; what was done was done in the exercise of a right, and the consequences are incidental, and no liability is incurred."

 III. The cost of replacing plaintiff's gravel dam with a permanent concrete structure would not be a proper basis upon which to fix just compensation even if the damage to the dam site was to be deemed a taking.

The criticism appearing, 58 Ct.Cl. at page 431 of the court's opinion in Southern Pacific Co. v. United States, supra, is applicable to the instant case:

"No attempt has been made by the plaintiff in this case to show what the value of its right-of-way was, which it claims was appropriated; all it has proved is that its right-of-way and tracks were damaged, and that in order to prevent further damage it has expended a certain sum of money for that purpose. It is not suing here for the value of property destroyed but for work done to protect property not yet developed. We do not think that such an expenditure can be held to be a basis upon which to fix just compensation for property appropriated by the Government."

If it appeared in this case that the ineffectiveness of plaintiff's gravel diversion dam was definitely attributable to the defendant's wrong, and that nothing short of a permanent concrete structure could restore to plaintiff the value of its easement, the uncertainty as to the exact amount of expense which might be required to restore plaintiff to its former position would not be fatal to plaintiff's claim. As stated in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544, "The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."

But on the record in this case it seems fairly inferable that though the removal of gravel by defendant may have brought about in substantial part the necessity to replace the dam in 1943, even without that contributing factor the stream bed would have ultimately washed and eroded to such a depth that plaintiff would have found the gravel dam ineffective. This is especially true since the building of another dam above the reservoir dam had, according to the evidence, prevented the downflow of debris and mountain silt, which had helped to hold the gravel in place below the diversion dam, and had thus caused the natural erosion to be accelerated. Then, too, other contractors than the Government Army units removed considerable quantities of gravel and the record is uncertain as to how much this contributed to plaintiff's damages. Hence it cannot be said that the full cost of the concrete dam was definitely attributable to defendant's act.

It would seem rather strange to hold that plaintiff, as the holder of a mere prescriptive right, could scrape up the gravel of the owner each year, throw it across the channel, cut it at the end of the season and permit it to wash away, thus removing it entirely from the premises, and that the title-owner would be compelled to go to other sources for any gravel it wished to use, when these outside sources were just as available to the holder of the prescriptive right as they were to the title-owner. We get bogged down when we attempt to follow plaintiff's logic which leads inevitably to that conclusion.

It follows that plaintiff's petition should be dismissed. It is so ordered.

WHALEY, Chief Justice, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.