UNITED STATES of America, Plaintiff,

v.

3276.21 ACRES OF LAND (MIRAMAR), Defendant.

No. 2161–SD–C.

United States District Court
S. D. California, S. D.

Oct. 21, 1963.

See also D.C., 194 F.Supp. 297.

Francis Whelan, U. S. Atty., Richard Dauber, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Anson, Gleaves & Larson, Los Angeles, Cal., and James L. Focht, Jr., San Diego, Cal., for defendant Myers.

Edwin Campbell, Chula Vista, Cal., for defendant Nelson Sloan.

Glenn & Wright, San Diego, Cal., for S. D. Golf Syndicate and defendants James.

Rubin, Seltzer & Solomon, San Diego, Cal., for defendants Marvin and Alisia Biddle and David and Diane Lipkin.

Joseph McDonough, San Diego, Cal., for defendant Charles Smith.

Luce, Forward, Hamilton & Scripps, San Diego, Cal., for Holzman, Receiver for Rogers Construction.

JAMES M. CARTER, District Judge.

The jury in this land condemnation case, pursuant to the court's instructions, returned a verdict on two alternatives—

(1) A first alternative in which they valued the land as of the date of taking, ignoring all flights over the land after August 1955 and until the date of taking in July of 1958; and also ignoring all regular and systematic flights over the land under the public domain occurring prior to August 1955, (Verdict $3,250,-000), and

(2) A second alternative in which they also ignored all flights after August 1955 until the date of taking, but did take into account the regular and systematic flights over the land under the public domain occurring prior to August 1955. (Verdict $3,075,000).

The alternatives were submitted to the jury in the hope if the court chose the wrong one in entering judgment, it might be possible for an appellate court, if it reversed, to select the other alternative and avoid a new trial.

The problem of considering the flights prior to August 1955 was not a matter of enumerating the number of flights in considering each as a separate trespass, but was to determine what sort of a flight pattern the property was subject to as of August 1955. Therefore the pattern of flights prior to that date would demonstrate what sort of flights the willing buyer and willing seller would anticipate would take place over the property.

### The Position of the United States

The position of the United States was that the flights over the subject land had, by February of 1952 become so extensive and so interfered with the rights of the owners of the subject land, that the government had taken an incipient easement beginning in 1952 and by July of 1958, the date of taking, had acquired title to the aviational easement. The government argued that the land owners cause of action in the court of claims accrued by at least February of 1952; that there was a 6-year statute of limitations and that by July 1958, that statute had run

and on the date of taking the government owned an aviational easement over the property. The government further argued that since in July of 1958, it owned the aviational easement, it had to pay only for the value of the fee, less the value of the aviational easement.

### The Findings of the Court

The court found on disputed evidence in a non-jury proceeding that the government flights did not become so extensive and so oppressive as to constitute the beginning of a *taking* until August of 1955; and that beginning in August 1955, the flights were so extensive and oppressive, and so interfered with the uses of the subject land, that there began the course of conduct, which on the subsequent happening of one of two events, would give the government title to an aviational easement—(1) if such flights continued in like manner for a period of six years, the easement would be acquired by adverse possession; (2) since title does not pass until either a statute of limitations has run or compensation is paid, Hanson Lumber Co., v. United States, 261 U.S. 581, 587, 43 S.Ct. 442, 67 L.Ed. 809; United States v. Dow, 357 U.S. 17, 21–22, 78 S.Ct. 1039, 2 L.Ed.2d 1109, that if the government paid compensation prior to the expiration of six years after August 1955, title to the easement would pass to the government.

The court found that in July of 1958, the government purported to take the entire fee, and made a deposit of the amount of money, which the government represented was fair compensation. Thus, the government by its deposit in July 1958, paid for the easement which they started to take in August 1955; and took and made a deposit for the balance of the fee, and after July 1958 the government had full and complete title.

Accordingly, the court ruled that the jury would not be concerned with flights after August 1955, since in substance, the government's right to an easement for flight dated back to August 1955, when compensation was deposited in July of 1958.

## Defendants' Position

The defendants' position is predicated upon the contention that the reverse of the principle in the Miller case should apply. United States v. Miller, 317 U.S. 369 at 376, 63 S.Ct. 276 at 281, 87 L.Ed. 336, holds that any increase in value due to the fact that a particular tract is clearly and probably within the project— [United States v. Cors, 337 U.S. 325, at 332, 69 S.Ct. 1086 at 1090, 93 L.Ed. 1392] "would reflect speculation as to what the government could be compelled to pay and hence in fairness should be excluded from the determination of what compensation would be just." United States v. 158.76 Acres of Land, [2 Cir. 1962] 298 F.2d 559 at 560, refers to the Miller rule, as follows: "Stating the rule in other words, the enhanced value created by the government's need for the property is not to be considered in determining the fair market value of the property condemned."

The reverse of the Miller case, postulated by the defendants found judicial expression, in 1961 in United States v. Virginia Electric & Power Co., 365 U.S. 624 at 636, 81 S.Ct. 784 at 792, 5 L.Ed.2d 838. The court first cited Cors and Miller and then said, "The court must *exclude any depreciation* in *value* caused by the prospective taking once the Government 'was committed' to the project. * * * As one writer has pointed out, '[i]t would be manifestly unjust to permit a public authority to depreciate property values by a threat * * * [of the construction of a government project] and then to take advantage of this depression in the price which it must pay for the property' when eventually condemned." [Emphasis added].

The defendants, by analogy say that the government may not trespass and make adjacent lands subject to trespass and thus diminute the value of the property later taken by the United States. See: Jensen v. United States, (Ct.Claims 1962) 305 F.2d 444 at 448, where the court of claims draws the reverse conclusion from the above cases.

The defendants also rely upon United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, which involved flowage easements where land was gradually, foot by foot, covered by the rising waters of the government improvement.

## DISCUSSION

### (a) *Flights—1955 to 1958*

Since the government argued and contended that they took an incipient easement in 1952, it certainly cannot contest the finding that an incipient easement was taken in August of 1955. By that time the flights were largely by jets, were far more extensive, far more oppressive and more extensively interfered with the use of the land.

Likewise, since the defendants contended that no incipient easement was taken before August of 1955; and contended that prior to August 1955 the flights were not so extensive and oppressive as to constitute an incipient taking, they cannot now be heard to say that there was a *taking* of an air easement before August of 1955.

We are therefore not too much concerned about the situation from August 1955 to July 1958. The real question is, should the jury have appraised the land as land which was subject to the regular and systematic flights under the public domain, as they occurred before August 1955, or should the jury have considered the land as being land that was not subject to any regular and systematic flights below the public domain prior to August of 1955.

### (b) *Miller case theory*

We think the Miller case and the Virginia Electric & Power case must be limited to the particular holdings thereof, namely that where property is *within the area contemplated to be included within the government project*, its value on condemnation may not be increased or decreased by the fact that the government will probably take the property.

We think that trespassing over defendants' property, *not sufficient to constitute a taking*, come within a different rule

when considered in the frame work of a condemnation case. United States v. Causby, [1946] 328 U.S. 256 at 266, 66 S.Ct. 1062 at 1068, 90 L.Ed. 1206, states:

" * * * Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land. * * * "

United States v. Dickinson, [1947] 331 U.S. 745 at 748, 67 S.Ct. 1382 at 1384–1385, 91 L.Ed. 1789, states:

" * * * Property is *taken in the constitutional sense* when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time. * * * " [Emphasis added]

United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746, states:

" * * * it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking. * * * "

In all three cases above Causby, Dickinson and Cress there was a *taking*, not mere trespasses. In Cress one of the land owners suffered periodic overflows which destroyed the use of the land during the times of overflow. This was held to be a *partial taking* of the property.

Griggs v. Allegheny County, [1962] 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 the latest of the Supreme Court cases is not too helpful. The State court found a *taking* occurred. The Supreme Court accepted this finding and the real issue decided was—who was to bear the burden of liability.

In our case the court found that there was no incipient taking until August 1955. Thus the finding was that until August 1955 the flights were not so frequent and oppressive as to constitute a direct and immediate interference with the land so as to constitute a taking.

We note also that the last phrase of the 5th Amendment of the Federal Constitution provides " * * * nor shall private property be taken for public use, without just compensation." The phrase must be distinguished from the provisions of state constitution, which often provide that private property shall not be taken *or damaged* for public use without just compensation. We think that incidental damage short of a taking, must be damage which must be borne by the land owner in this type of condemnation action and that if he has any remedy, it may be a remedy in the court of claims.

In Bedford v. United States, [1904] 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414, the United States constructed revetments on the Mississippi which had the effect of directing the river against the lands of claimants six miles below. The river eroded and overflowed 2300 acres of their land. Claimants sued in the court of claims which dismissed their petition. The judgment was affirmed by the Supreme Court.

The court said, "The Constitution provides that private property shall not be taken without just compensation, but a distinction has been made between damage and taking, and that distinction must be observed in applying the constitutional provision." (192 U.S. p. 224, 24 S.Ct. p. 240, 48 L.Ed. 414).

The court distinguished United States v. Lynch, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 when land was permanently flooded, as an appropriation of land without formal condemnation as contrasted with consequential damage in the Bedford case.

See: Camp Far West Irr. Dist. v. United States, 107 Ct.Cl. 263 (1946) 68 F.Supp. 908, 915–918.

Bedford was a true case of incidental or consequential damage. The land allegedly damaged was not part of any taking in condemnation. In our case the very land over which flights occurred is the land being condemned.

The case of Batten v. United States, [10 Cir. 1962] 306 F.2d 580, although

not directly in point, is persuasive. Essentially this case concerned owners of property adjacent to an airport where there was an interference with their use by noise, vibration and smoke by government jet planes. The planes however, did not fly *over* their property. It was held that plaintiff could not recover for claimed government taking of their property without compensation. True, the decision after citing various cases, states, "Absent such physical invasion recovery has been uniformly denied." (306 F.2d p. 584).

The decision was by an able judge of the 10th Circuit, Breitenstein, who stated the case was one of first impression. The dissent was by a similarly able Chief Judge of that Circuit, Murrah, but the Supreme Court denied certiorari.

■ We hold that the inconvenience, injury or damage suffered by a land owner by flights which did not become so extensive or oppressive as to constitute a *taking* are not matters which may be considered in a condemnation case. We pass no opinion as to whether or not a cause of action could have been maintained before the court of claims.

### (c) *The Dickinson case*

Likewise, we distinguish the Dickinson case, supra. The defendants attempt to equate the flight of first, single engine props, then 2-engine props, then 4-engine props, then jets, with the gradual covering of the land by the rising of water levels in the government project described in Dickinson. But there is a big difference. As each foot of land in the Dickinson case was covered by water there was a complete taking of that foot of land and foot by foot the water rose and more and more land was *completely* taken.

The issue in the Dickinson case was essentially the issue of the statute of limitations. When did the cause of action accrue? And the court properly held that the land owner did not need to bring a suit as each foot of land was taken but could wait until the matter became stabilized.

In our case there was not a complete taking bit by bit or foot by foot of land as the trespasses of the United States continued. Undoubtedly the first trespasses by single prop planes were so insignificant as to cause the land owner no concern whatsoever. Gradually the flights increased. Eventually, in August of 1955, the greatly accelerated number of flights by jets so interfered with the land, and became so oppressive that a *taking* was instituted or started. We term it an "incipient taking." Thus in our case, we had trespasses increasing bit by bit until the time the taking occurred. In the Dickinson case each foot of land was completely taken as the water rose and covered it.

■ We cannot escape the teaching of the cases that the government must pay in a condemnation case for property taken, but not for property damaged. Each trespass might be called damage to the property, but as set forth heretofore, the trespass did not become so extensive as to constitute an incipient taking until August of 1955. If each flight of a plane across the land owner's property below the public domain, and constituting merely a trespass gave rise to a cause of action, the situation that would result would be intolerable. The claims would flood the courts, the alleged damage would be in each instance almost impossible to ascertain.

Moreover, the problem must be viewed in the light of the present widespread use of air planes, private and military, and the fact that even though the majority of them fly on pre-determined courses, the problem of the errant plane off course will always be with us.

■ It would seem that the break line as to where compensable damage exists in either a case involving condemnation or inverse condemnation would be that time when the trespass flights became so intolerable, so oppressive and created such a substantial interference with the use of the property that they ceased to be a mere trespass and constituted a taking or incipient taking. See: Jensen v.

892

United States, (Court Claims 1962) 305 F.2d 444, at 447.

Notwithstanding the decision we have indicated heretofore, and summarized below, we do not think the question is entirely closed. The defendants make a most plausible argument that the government should not be permitted to depreciate property by trespass short of taking, and then condemn the property and have it valued at a lesser figure because of the trespass. Their analogy to the principle of the Miller case causes one to pause. It was because of the closeness of the question that the court submitted the two alternatives to the jury.

From the jury's verdict, we know that the jury considered the property to be worth $175,000 less because of the trespass to which the property was subject as of August of 1955. It is a large piece of property—2442 acres but the difference in the two figures in the verdict, to-wit $175,000 is substantial. It is equivalent to a little in excess of $70 per acre. This may sound like a brief for the land owners, but the court cannot disregard the closeness of the question.

CONCLUSION

We return to the position of the parties. The defendants contended, and presented evidence of fact showing there was no *taking* (incipient or otherwise) until August of 1955. The government on the other hand argued the *taking* began in February of 1952. It is only when a trespass becomes so intolerable and so oppressive as to completely interfere with the owner's use of the land, that a taking occurs. Causby, (supra), Dickinson, (supra).

Accordingly, we hold that judgment should be entered on premise #2 in which the jury were entitled to consider, that the land was subject to trespasses over it prior to August 1955, and we direct that judgment be prepared and entered for the amount fixed under that premise by the jury, to-wit, $3,075,000.